**UNITED STATES of America, Appellant,**

v.

**Frederick H. MOORE et al., Defendants, Appellees.**

**No. 76–1355.**

United States Court of Appeals, First Circuit.

Sept. 9, 1977.

As Amended On Denial of Rehearing Oct. 25, 1977.

points would be sufficient for a positive identification.

James E. O'Neil, Asst. U. S. Atty., Boston, Mass., with whom James N. Gabriel, U. S. Atty., Boston, Mass., was on brief, for appellant.

Evan T. Lawson, Boston, Mass., with whom Lawson & Wayne, Boston, Mass., was on brief, for defendants, appellees.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Appellees Frederick H. Moore and Brock P. Bobisink, and another, were charged with conspiracy to manufacture and distribute and with manufacturing and distributing phencyclidine, a Schedule III controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Prior to trial, they moved to suppress evidence seized by government agents after an investigation during which electronic beepers were used both to help monitor appellees' movements and to keep track of the whereabouts of certain chemicals in their possession. Holding that the use of the beepers violated the fourth amendment, the district court allowed the suppression motion. *United States v. Bobisink*, 415 F.Supp. 1334 (D.Mass.1976). From that order, the Government appeals. *See* 18 U.S.C. § 3731.

The facts were before the district court in the form of two affidavits of DEA agents submitted with the applications for search warrants, and the testimony at the suppression hearing of Special Agent Francis J. Elliott. Agent Elliott had received a call from the manager of the Doe & Ingalls Chemical Company of Medford, Massachusetts, informing him that Moore, purportedly representing a company called Plastico at 26 Allston Street, Allston, Massachusetts, had placed an order for a substantial quantity of chemicals and had picked up the chemicals for $776.36 in cash. While picking up the first batch of chemicals, Moore had placed another larger order for mostly different chemicals. (The names and amounts of all the chemicals were obtained by Agent Elliott and later listed in his affidavit; in the affidavit the agent stated that he was "familiar with the basic processes involved in the production of Schedule III controlled substances.")[1] Upon investigation, Agent Elliott found that 26 Allston Street, Allston, Massachusetts, was an apartment house. On April 11, 1975, with the permission of Doe & Ingalls, DEA Agent Witt placed a self-powered electronic signalling device (a "beeper") within one of the cardboard boxes containing the chemicals which Moore had ordered on March 26. On April 14, Moore and Bobisink came to Doe & Ingalls to pick up the chemicals. Driving a U-Haul van, they parked in the lot of a nearby shopping center and went inside. The chemicals ordered on March 26 were available, with the exception of peperidine. While the two were inside, Agent Elliott placed a second beeper on the left rear undercarriage of the van. Moore and Bobisink got in the van with the chemicals and went on their way. Elliott and another DEA agent followed, alternately relying on visual surveillance and on the two beepers. The beepers were broadcasting at different frequencies, and the agents could receive only one signal at a time. At a point when the van was travelling on Route 6 on Cape Code, the agents lost visual contact and could not receive a signal from either beeper. But observing the van on Route 124 crossing over Route 6, the agents quickly exited themselves, proceeded down Route 124 approximately one mile, and saw the van parked in front of a house in Brewster, Massachusetts. Agent Elliott testified that the agents relied on the beepers 50% of the time while following defendants. From April 14 to April 29, the agents maintained sporadic surveillance of

---

1. Although the alleged end-product, phencyclidine, is a controlled substance, none of the chemicals that were purchased are within that category; they may be possessed legally. One of the ordered chemicals, peperidine, was described by Agent Elliott in his affidavit as "a necessary chemical for creating Phencyclidine".

the Brewster home. Until the battery became worn, they used the beeper in the box of chemicals to determine that the box was still in the residence. On April 23, Elliott searched the records of the DEA computer bank of registrants and determined that neither Moore nor Plastico was licensed to manufacture controlled substances.

On April 29, Moore and Bobisink returned to Doe & Ingalls to pick up the one chemical, peperidine, that had not been available on April 14. While Moore and Bobisink were inside, Agent Elliott attached a beeper to the gasoline tank of Moore's 1966 Mustang. Elliott testified that he did not follow the Mustang, but instead the vehicle was trailed by another agent, who he assumed used the beeper to maintain surveillance. The vehicle was driven to the Brewster residence, where defendants were observed carrying the package of peperidine inside. Beginning on April 29, a 24-hour surveillance was maintained on the Brewster residence. That evening, according to Elliott's affidavit, he "detected a strong odor of ether emanating from the house and also observed the house being crossventilated by the opening of doors." The affidavit avers further that at that time "[t]he electronic surveillance signal placed in the chemicals . . . indicated the chemicals acquired on the 14th of April and observed and deposited at that house on the 14th of April remained in that house." On May 2, DEA agents made application for a search warrant for the Brewster property. The warrant was executed on May 7, and a number of chemicals and apparatus was seized. The following day a search warrant issued for the Allston apartment; its execution resulted in seizure of small amounts of chemicals and apparatus.

At the suppression hearing, appellees' primary argument went to the alleged illegality of the beepers, but they also argued, as they do on appeal, that no search warrants should have issued since the affidavits did not establish that the chemicals purchased and appellees' activities were directed towards manufacturing the controlled substance, phencyclidine. The district court, dealing only with the beeper issue, suppressed the evidence obtained from the searches because it held that "placement of the beepers under the circumstances of this case was a search and seizure under the Fourth Amendment requiring issuance of a search warrant." The Government asserts that was error. It urges us to sanction use of the beeper as a new and useful surveillance device.

■ Before turning to the question of the beepers, we consider the sufficiency of the affidavits underlying the warrants to search the Brewster house and the Allston apartment. Affidavits are most often criticized as being too conclusory, i. e. lacking in sufficient underlying facts and circumstances. *See, e. g., Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The opposite difficulty is present here: while in his affidavit for the Brewster property Agent Elliott carefully itemized by name and quantity the chemicals that were sold to appellees, he never actually stated, on the basis of his asserted familiarity with the processes in the production of Schedule III controlled substances, that these chemicals in these amounts were predictable precursors of phencyclidine. However, the affidavit strongly implies that he held such an opinion. It declares that the affiant has reason to believe that "controlled substances, including, but not limited to, Phencyclidine, substances, salts and isomers of the same and immediate precursors of the same . . . and manufacturing apparatus and items for the manufacture of controlled substances . . ." are being stored on the premises. In support of this, the affiant recounts how the manager of Doe & Ingalls initiated contact with DEA agents, advising of the purchase of certain named chemicals in the designated amounts, and details the other events leading up to the detection of a strong ether odor from the Brewster house. Emphasizing that the chemicals remained in the house, he concludes that he "therefore" had probable cause to search and seize "controlled substances, precursors, manufacturing apparatus and material for manufacturing controlled substances". Peperidine, one

of the chemicals, was described as "a necessary chemical for creating Phencyclidine".

A commonsense reading of the affidavit indicates that Agent Elliott, being familiar with the basic processes of manufacturing controlled substances, had determined from the nature and quantity of the purchased chemicals, and from associated facts such as that Moore was operating out of a residence and the defendants' later conduct, that an illegal substance was being manufactured. While he did not state that chemicals of this type and amount comprise the formula for phencyclidine, or enough of it to show that phencyclidine was a probable end-product, that conclusion seems implicit. In *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), the Court pointed out that affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." Courts should not invalidate a warrant by interpreting the affidavit "in a hypertechnical, rather than a commonsense manner." *Id.* at 109, 85 S.Ct. at 746. A magistrate's determination of probable cause is entitled to great deference. *Jones v. United States,* 362 U.S. 257, 270–271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), cited with approval in *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). While the Government's failure better to explain its conclusions reflects adversely on whoever drafted the affidavit, we believe the magistrate was given adequate cause to determine that the proposed search was likely to uncover evidence of crime, and the same is true with respect to the second affidavit and warrant.

We come next to use of the beepers, a question that, in the broad sense, is unlikely to be settled finally in this court. Beepers, which do not relay oral communications, are not within the definition of wiretapping devices. *See* 18 U.S.C. § 2510(5). Giving off a steady signal which may be picked up by a receiver, they are useful to keep track of a vehicle, person or object. They do not permit a pinpoint fix, but enable agents to know when the beeper is nearby. The question is whether use of a beeper constitutes, in different settings, such an intru-

sion upon personal privacy as to violate the fourth amendment.

In *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Court held the "Government's activities in electronically listening to and recording [defendant's] words", spoken while he was inside a public telephone booth, "violated the privacy on which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." *Id.* at 353, 88 S.Ct. at 512. The Court's premise was that Katz was entitled to assume when he entered the telephone booth "that the words he utters into the mouthpiece will not be broadcast to the world." *Id.* at 352, 88 S.Ct. at 512. Behind this premise was the Court's earlier conclusion that the fourth amendment extends to the recording of oral statements. *Id.* at 353, 88 S.Ct. 507; *see Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); *Silverman v. United States,* 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). Under the *Katz* analysis, the question would be whether attachment of the beepers, monitoring of the movements of the U-Haul van and 1966 Mustang, or use of the beeper in the package of chemicals to determine its continued presence inside the Brewster property, violated any "privacy on which [appellees] justifiably relied".

The defendants argue that citizens have "a reasonable expectation of privacy in their movements", and that the "possibility of being followed about in public by governmental agents" does not mean that they anticipate "that their every movement will be continuously monitored by a secret transmitter". Defendants draw an analogy to *Katz*: while the telephone booth itself was public, the defendant was entitled to keep out the "uninvited ear". While transporting chemicals on the public highway is "subject to the eyes of the public", defendants, so they assert, may keep out the "uninvited monitoring device".

■ We find no merit in the Government counter argument that the beeper was jus-

tified simply because the substance being manufactured was a dangerous drug which the public would not want to go undetected. Conduct which violates the fourth amendment is not made legal merely because it helps ferret out crime. If that were so, any invasion of privacy would be acceptable if it helped the police. It is true that the reasonableness of a search and seizure is sometimes said to involve balancing the Government's interest in the intrusion against the individual's interest in privacy. *See, e. g., United States v. Martinez-Fuerte,* 428 U.S. 543, 555, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Klein,* 522 F.2d 296, 300–01 (1st Cir. 1975). But under the Government's formulation, we are not asked to balance the competing interests but simply to ignore the individual's interest altogether.

The Government may be struggling to argue another proposition. We and other courts have upheld the placing of beepers, without warrant, in contraband, stolen goods and the like on the theory that the possessors of such articles have no legitimate expectation of privacy in substances which they have no right to possess at all. *United States v. Emery,* 541 F.2d 887 (1st Cir. 1976); *United States v. Bishop,* 530 F.2d 1156 (5th Cir. 1976); *United States v. Perez,* 526 F.2d 859, 863 (5th Cir. 1976). The Government may be trying to expand that principle to include the warrantless insertion of a beeper in legally possessed non-contraband substances whose probable use is to make an illegal drug. But there is a clear line of demarcation between, on the one hand, contraband and other items, such as stolen goods, whose possession is illegal, and on the other, goods, whatever their suspected use, whose possession is legal. The narcotics peddler in whose heroin a beeper is planted has no privacy interest in the substance; but the same is not so of legally-possessed substances into which a beeper is placed, even if these are destined later to be used in the commission of a crime. We would limit the authority of cases such as *Emery* to concealment of beepers in contraband substances or, at least, in items which are part and parcel of an ongoing criminal transaction (*United States v. Perez, supra,* beeper concealed in TV set taken in exchange for sale of heroin.)

The present case involves two generic uses of the beepers; first, to keep track of the motor vehicles;[2] and second, to ascertain if the chemicals were still in the house in Brewster. Each of these uses requires, we believe, separate analysis. While we hold that both uses of beepers intruded to some degree upon defendants' reasonable privacy expectations, we believe that the privacy interest affected by using a beeper to maintain surveillance of a vehicle on public roads is much less than in the later instance. We hold, therefore, that given probable cause, no warrant was required for the vehicular surveillance.

Turning first to the vehicular surveillance, we do not find it critical that the beeper placed in the package of chemicals was inserted before title to the chemicals passed to defendants, while the beepers affixed directly to the vehicles were attached without the owners' permission and hence involved a trespass. *See United States v. Hufford,* 539 F.2d 32 (9th Cir. 1976). Whatever the legal situation at the moment when the beeper was put in the chemicals, the Government intended the device to be operative, without defendants' acquiescence or knowledge, after the chemicals were lawfully in their possession. And the trespass involved in affixing the beepers to the underbody of the vehicles was, standing alone, so minimal as to be of little consequence. *See Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (no fourth amendment violation in removing paint

---

2. For the fourth amendment purposes, where the issue is whether there was an invasion of a privacy interest, we think it makes better sense to classify the beepers functionally, i. e. by whether or not they were used to tail a vehicle, or else for some different purpose, rather than by whether the beepers were in a package or affixed to the vehicle's underbody. To the extent the packaged beeper was used to follow the vehicle, we think it presents the same fourth amendment problems as the attached beepers.

scrapings from a parked car). The agents had a right to be in the parking area; they did not open or search the vehicles. *See United States v. Frazier*, 538 F.2d 1322, 1326 (8th Cir. 1976) (Ross, J., concurring); *United States v. Holmes*, 537 F.2d 227, 230 (5th Cir. 1976) (Ainsworth, J., dissenting). As with insertion of the beeper in the chemicals, the important factor seems to be not that there was or was not a common law trespass *ab initio*, but that a honing device was surreptitiously implanted in private property in order to enhance the agents' ability to shadow the property and its possessors.

The basic question is simply whether the use of beepers so implanted to monitor the movements of the U-Haul van and the 1966 Mustang from Doe & Ingalls in Medford to the residence in Brewster violated defendants' reasonable expectations of privacy. Defendants argue, that they had a reasonable expectation that their vehicle's movement would not be continuously monitored and tracked by use of a transmitter implanted without their knowledge or consent on or in the vehicle in which they were riding.

But while this may be so, we agree with the Government that the privacy expectations of one operating a vehicle on public roads are considerably less than those of one speaking on the telephone from a closed booth, as in *Katz*. In *Katz* the Court spoke of the "vital role that the public telephone has come to play in private communication", and expressed the urgency of extending the fourth amendment to oral statements meant to be kept private. 389 U.S. at 352–53, 88 S.Ct. at 512. But the Court also pointed out that a person had no reasonable expectation of privacy in that which is knowingly exposed to others. *Id.* at 351, 88 S.Ct. 507. Defendants here had no reason to believe that their movements on the public highway would remain private—that their route from Medford to Brewster would be their secret. "A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view." *Cardwell v. Lewis, supra,* 417 U.S.

at 590, 94 S.Ct. at 2469. *Accord, United States v. Chadwick,* —— U.S. ——, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Moreover, defendants had no right to assume that law enforcement officers would not enhance their ability to see or track them by use of various artificial means such as binoculars or even radar, or by observing them from the air. *See, e. g., United States v. McCall,* 243 F.2d 858 (10th Cir. 1957).

Use of a beeper to monitor a vehicle involves something more, however, than magnification of the observer's senses as in the use of a helicopter, binoculars, radar, or the like. Whether or not the beeper is legally implanted by use of stealth or attached by a technical trespass to the vehicle, it transforms the vehicle, unknown to its owner, into a messenger in the service of those watching it. While a driver has no claim to be free from observation while driving in public, he properly can expect not to be carrying around an uninvited device that continuously signals his presence.

We conclude that while the intrusion involved in surveillance of a vehicle by beeper is considerably lessened by the fact that one driving on public roads knows that he is subject to public scrutiny, still the intrusion cannot be written off as non-existent. And even though searches of automobiles often present exigent circumstances that permit the Government to dispense with warrants, *see United States v. Chadwick, supra,* —— U.S. at ——, 97 S.Ct. at 2483–2484, it does not follow that searches coming within this exception can be conducted in all situations at the unlimited discretion of the police. The fourth amendment still places clear limits on official behavior in this context. We think it in keeping with Supreme Court precedent in other vehicular contexts, *see, e. g., Almeida-Sanchez v. United States,* 413 U.S. 266, 279, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (Powell, J., concurring); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), to hold that while the lessened expectancy of privacy associated with motor vehicles justifies the use of beepers without a warrant to track vehicles, this can be done only if the officers have

probable cause at the time. *Cf. United States v. Holmes, supra,* 537 F.2d at 228–29 (Ainsworth, J., dissenting).[3] A rule disposing of a warrant requirement where the movement of vehicles on public roads is involved, accommodates the genuine law enforcement interest in moving quickly to keep track of suspected criminals and is analogous with the application of the fourth amendment to motor vehicles in other contexts. On the other hand, by not licensing the indiscriminate use of beepers, it maintains a significant degree of protection.

■ On the record before us, we find ample evidence that at the time the vehicular surveillance was undertaken, the agents had probable cause to believe that a controlled substance was about to be made illegally. The call from the drug company, the discovery that the address given by the purchasers was not one where a chemical manufacturer would operate, and the nature of the chemicals purchased, in light of the agents' familiarity with the manufacture of controlled substances, together created a sufficient basis for believing a criminal enterprise was under way.[4] We therefore hold that the use of the beepers to monitor the vehicles did not violate the fourth amendment even though no warrant was obtained.

■ This does not end the matter, however, since the beeper inside the box of chemicals was used after April 14 to determine the continued presence of the package inside the Brewster residence. Agent Elliott so testified; his affidavit filed in support of the search warrant for the Brewster property indicates that the beeper was used on April 29 to determine that the chemicals were still in the house. With respect to the need for a warrant, this use of a beeper must be distinguished from its use to monitor the movements of a vehicle on public highways. *United States v. Chadwick, supra.* The lessened expectancy of privacy applicable to vehicles has no relevance to this situation, and we can think of no other exception or analogy that might excuse the agents in these circumstances from securing a warrant, which provides the safeguard of the "detached scrutiny of a neutral magistrate". *Id.* —— U.S. at ——, 97 S.Ct. at 2482. As *Chadwick* recently reiterates, judicial warrants are the normal prerequisite to governmental conduct covered by the fourth amendment. When defendants withdrew from the public view, taking the box of chemicals inside with them, they had every right to expect that their activities inside the house which they sought to preserve as private would be free from warrantless intrusion by the Government. Doubtless the limited data transmitted by a beeper was far less revealing than the conversation recorded in *Katz*; the level of intrusion was less severe. Still, as the chemicals containing the transmitter were not contraband or otherwise wrongfully in appellees' possession, the Government had no right to determine their continued presence in the house by use of warrantless electronic surveillance.

> "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure."

*Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886).

■ Because warrantless use of the one beeper inside the box of chemicals to deter-

---

**3.** Judge Ainsworth urges a more relaxed "reasonable cause" standard. *See United States v. Holmes,* 537 F.2d at 228–29 (5th Cir. 1976). *Cf. South Dakota v. Opperman,* 428 U.S. 364, 369–70, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Martinez-Fuerte, supra; Terry v. Ohio,* 392 U.S. 1, 30–31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We need not decide that question here, as the government met its burden under either standard. Based on what has so far been argued to us, we do not see that a standard less than probable cause would be warranted, but we do not foreclose further consideration of the issue.

**4.** The duration of the planned surveillance in this case was for a period limited to the delivery of the materials to the place of manufacture. We do not consider what if anything might be additionally required if the planned surveillance by beeper contemplated an extensive period of time.

**114**

mine their continued presence in the Brewster residence infringed on defendants' fourth amendment rights, evidence obtained from the searches must be suppressed unless it was come at not by exploitation of the illegality but instead by distinct means which purge the evidence of the primary taint. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Race,* 529 F.2d 12, 15 (1st Cir. 1976). The parties did not focus on this issue below, and we are in a poor position to decide the question ourselves. It is by no means clear that the Government placed no importance on the information received from the beeper inside the house; Agent Elliott's affidavit refers to the beeper in this regard. On the other hand, this bit of information seems quite minor in comparison to the other facts known to Elliott—the suspicious purchase; the drive to the secluded residence; the odor of ether and the cross-ventilation—and, moreover, the beeper appears to have worn out at some point. The district court should make a finding on this question upon remand and take action accordingly.

*The order is vacated and the matter remanded for further proceedings in accordance herewith.*