UNITED STATES of America, Plaintiff-Appellee,

v.

John Bradley LEWIS, Jr., Kenneth Brooks, a/k/a James Earl Brooks, Homer Lee Hicks, Robert Charles Terry and Ray Charles Jackson, Defendants-Appellants.

No. 79–5182.

United States Court of Appeals, Fifth Circuit.

July 25, 1980.

Walter R. Krousel, Baton Rouge, La., M. Gabriel Nahas, Jr., Houston, Tex., for Lewis.

Nathan S. Fisher, Baton Rouge, La., for Brooks.

Lewis O. Unglesby, Baton Rouge, La., for Hicks.

James E. Boren, Baton Rouge, La., for Terry.

Bryan E. Bush, Jr., Baton Rouge, La., for Jackson.

Donald L. Beckner, U. S. Atty., Shelly C. Zwick, Asst. U. S. Atty., Baton Rouge, La., for plaintiff-appellee.

Before VANCE, POLITZ and RANDALL, Circuit Judges.

POLITZ, Circuit Judge:

Kenneth Brooks, Homer L. Hicks, Ray C. Jackson, John B. Lewis, Jr., and Robert C. Terry were convicted after a bench trial in the Middle District of Louisiana of: (1) conspiracy to manufacture, possess with intent to distribute, and distribute phencyclidine (PCP), in violation of 21 U.S.C. § 846; (2) the manufacture of PCP, in violation of 21 U.S.C. § 841(a)(1); and (3) possession of PCP with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). On appeal they claim that the evidence leading to their convictions should have been suppressed because of Fourth Amendment violations. We affirm the convictions.

### The Facts

In July, 1978, Hicks and Lewis arranged to purchase a large quantity of chemicals from the McKesson Chemical Company (McKesson) of Houston, Texas, in order to make PCP. Lewis placed an order for 55 gallons each of piperidine, cyclohexanone, and bromobenzine, 100 pounds of magnesium turnings, 120 pounds of sodium cyanide, two cases of hydrochloric acid, 220 gallons of anhydrous ethyl ether and 110 gallons of petroleum ether. McKesson did not have the piperidine in stock and had to order it from the Wyandotte Corporation (Wyandotte) in New Jersey. Since piperidine was then on a "watch list," Wyandotte notified the Drug Enforcement Administration.

In response to McKesson's inquiries, the defendants gave assurances that the drugs were being purchased for Tulsa Metal Processing Company, and that the chemicals would not be used for making illegal drugs. Tulsa Metal Processing Company did not exist. It was a cover.

The purchase price for the chemicals was slightly in excess of $6,000. It was understood that the entire purchase price was to be paid in cash, before delivery. On August 8, 1978, Hicks gave an associate $5,000 which was delivered to McKesson in the form of a cashier's check. Testimony at the

suppression hearing indicated that Terry was to reimburse Hicks for a portion of this deposit. The balance of the purchase price was to be paid at time of delivery. A dispute exists as to when title passed. The magistrate found that the parties intended that title would not pass until the purchase price was paid in full. The defendants urge that title passed earlier, or at least that a property interest in the chemicals vested before delivery.

Upon being advised of the order by Wyandotte, the DEA began an investigation in Houston, headed by Agent Ronald Gospodarek. DEA agents and officials of McKesson decided that the 55 gallon drum of piperidine would be shipped from Wyandotte to Gospodarek for use in the investigation. Wyandotte agreed to this plan. Gospodarek then secured from DEA inventory a specially made 55 gallon drum, with a built-in tracking device known as a beeper. The beeper had a range of about one and one-half miles. Gospodarek had the beeper drum painted to look like the drum containing the piperidine and transferred the piperidine into it. He then brought the beeper drum containing the piperidine to McKesson. After doing so Gospodarek tested the beeper. The test was done before delivery of the drum to Lewis, and before Lewis was told the order was ready for delivery.

After taking the drum to McKesson, Gospodarek and an assistant United States Attorney appeared before a United States Magistrate in Houston and sought an order authorizing use of an electronic tracking device. Gospodarek's affidavit filed with the motion did not mention that the beeper drum was already prepared and ready for use. On September 5, 1978, the magistrate found probable cause and authorized the installation and use of the beeper.

Two days later Lewis and another man came to the McKesson premises and paid the balance of the purchase price. They took possession of the chemicals and drove them to a remote farm in Livingston Par-ish, Louisiana, where the chemicals were taken to a "laboratory" in the woods. DEA agents followed the progress of the chemicals visually and by use of the beeper.

The farm was located in an area of roughly 52 acres, composed primarily of piney woods, with some cleared portions that were cultivated or formerly under cultivation. About two-thirds of the area was uninhabited. The laboratory site where the PCP was made was located over 800 feet from a tree line behind the Lewis family home. A more detailed description of the site is found *infra*.

During the night of September 12 or 13, 1978, DEA agents trekked through the woods and visited the laboratory site. They seized nothing, leaving the site after seeing the set-up and smelling what appeared to be PCC (a precursor chemical of PCP).

On September 14, 1978, the agents applied to United States Magistrate (now judge) Polozola in Baton Rouge for search warrants for the farm, including the laboratory site in the woods, and two vehicles. The magistrate issued these warrants on September 15, 1978.

After securing the warrants the agents visited the laboratory site on several occasions, but did not find it propitious to execute them. They continued their surveillance of the operations and of the comings and goings of the defendants. On September 18, 1978, the agents decided to execute the warrants because Hicks had suddenly departed and they could not locate two of the other defendants. At about 5:30 p. m., the agents searched the farm and the laboratory site, including a tent and a tarpaulin-covered pile found at the site.

Shortly thereafter, the five defendant-appellants and three others were charged with (1) conspiracy to manufacture, to possess with intent to distribute, and to distribute PCP, in violation of 21 U.S.C. § 846; (2) possession of PCC with intent to manufacture PCP; (3) manufacture of PCC; (4) manufacture of PCP; and (5) possession of

PCP with intent to distribute. Each of the last four charges involved violations of 21 U.S.C. § 841(a)(1).

The defendants filed motions to suppress the evidence gained from use of the beeper and seized during the search of the lab site. The motions were heard by the magistrate, who rejected them in a comprehensive 38-page opinion. All of the defendant-appellants except Jackson objected to the report and asked the district court for a *de novo* determination. The district court adopted the magistrate's findings without a hearing and without having a complete transcript of the suppression hearings.

The defendants sought to plead guilty conditioned on an appeal of their Fourth Amendment claims. This request was denied. As a result, three of the defendants pleaded guilty and did not appeal. Lewis, Hicks, Jackson, Brooks and Terry elected to go to trial. The trial was brief: the government and the parties stipulated the facts and agreed that counts (1), (4) and (5) would be tried without a jury. The district judge found the defendants guilty on counts (1), (4) and (5). The other counts were dismissed after the trial, pursuant to an understanding between the government and the defendants. The defendants were sentenced to 5 years on each count with the sentences to run consecutively. Lewis, Brooks, Terry and Jackson were sentenced to concurrent special parole terms of 25 years, and Hicks was sentenced to a concurrent special parole term of 50 years.

### Untimely Reply Brief

On the day before oral argument Lewis filed a reply brief which was untimely under Fed.R.App.P. 31(a). Permission to file was neither sought nor granted. Much of this brief discusses an issue not raised in earlier briefs. We do not consider it.

### Magistrates, De Novo Review and Appealability

Under 28 U.S.C. § 636(b)(1)(B), a district judge can designate a magistrate to make findings of fact and recommendations for disposition on a motion to suppress evidence in a criminal case. If any party objects to the findings and recommendations, the judge must conduct a *de novo* review. Section 636(b)(1)(B) provides:

> [A] judge may . . . designate a magistrate to conduct hearings . . . and to submit to a judge of the court proposed findings of facts and recommendations for the disposition, by a judge of the court, of [motions to suppress evidence in a criminal case] . . . .

> \* \* \* \* \* \*

> Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

■ Jackson did not object to the magistrate's report and recommendations on the suppression motions. His failure to object is a waiver of his right to appeal the recommendations contained in the report. The Second Circuit recently reached the same conclusion. *John B. Hull, Inc. v. Waterbury Petroleum Prod., Inc.,* 588 F.2d 24 (2d Cir. 1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979). Jackson's appeal is, accordingly, dismissed.

■ Brooks, Hicks, Lewis and Terry contend that the district judge's affirmance of the magistrate's findings on the suppression motions without a hearing violated the Due Process Clause of the Fifth Amendment. Gospodarek was the government's key witness. The defendants contend that the district court was required to rehear all testi-

monial evidence to determine his credibility, citing *United States v. Raddatz*, 592 F.2d 976 (7th Cir. 1979). The Supreme Court, in reversing this decision, held that the district court is not required to rehear testimony when a suppression hearing has been referred to a magistrate. *United States v. Raddatz*, —— U.S. ——, 100 S.Ct. 2406, 64 L.Ed.2d 141 (1980). It is for the district court to decide how much it wishes to rehear. This was already the prevailing rule in this circuit. *United States v. Whitmire*, 595 F.2d 1303 (5th Cir. 1979).

The district judge conducted his *de novo* review of the magistrate's findings on February 1, 1979. He had transcripts of suppression hearings held on September 28, 1978, November 30, 1978 and December 1, 1978. He did not have a transcript of the suppression hearing held on January 19, 1979. Gospodarek testified on all four days. A surveyor also testified on January 19, 1979. The defendants argue that the *de novo* review was inadequate because the trial judge did not have a complete transcript of the proceedings before the magistrate.

 We hold that when there are contested issues of fact, 28 U.S.C. § 636(b)(1) requires a complete transcript of the suppression hearing for the *de novo* review, unless the parties stipulate otherwise. The district judge erred in making his *de novo* determination without a complete transcript, because without it he could not adequately assess the magistrate's findings of fact and conclusions as to the credibility of the witnesses. *Cf.* Fed.R.Civ.P. 53(e)(1) (special masters must file transcripts of proceedings).

 We would ordinarily remand for a *de novo* review, but for reasons of judicial economy we will not. The *de novo* review envisioned by the statute consists of a review of the transcript and documentary evi-

dence.[1] The seven-volume record in this case is before us. An appellate court, faced with inadequate fact findings by the trial court and a wholly documentary record, can make its own findings without a remand. *Armstrong v. Collier*, 536 F.2d 72 (5th Cir. 1976); *McComb v. Utica Knitting Co.*, 164 F.2d 670 (2d Cir. 1947). Consistent with that, we have conducted our own *de novo* review of the magistrate's findings, and we adopt them.

### The Beeper

Gospodarek had permission from Wyandotte and McKesson to transfer the piperidine from the Wyandotte drum into the beeper drum. He made the transfer before securing the magistrate's authorization and before delivery of the drum to the defendants. The defendants contend that the transfer of the piperidine before obtaining a warrant violated the Fourth Amendment. This plunges us into the swamp of beeper law.

Beepers cannot be neatly categorized for Fourth Amendment purposes. They convey information about location that is ordinarily gained by visual surveillance. The beeper, which sends out a signal monitored by the police at a distance, electronically enhances the ability of the police to conduct surveillance. If the police lose sight of their quarry, they can easily find it again. The object of the search usually is not aware that his movements are being monitored. A beeper does not say "who," but only "where." It intrudes on personal privacy less than a wiretap, *cf. Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), but more than visual observation, *cf. United States v. Pitts*, 588 F.2d 102 (5th Cir. 1979), *cert. denied*, 441 U.S. 948, 99 S.Ct. 2171, 60 L.Ed.2d 1051. *See generally* Note, *Tracking Katz: Beepers, Privacy and the Fourth Amendment*, 86 Yale L.J. 1461 (1977).

The problem is compounded when beepers are used to track the location of goods.

---

1. A trial judge conducting a *de novo* review can order additional evidentiary hearings if his examination of the transcript raises questions. We could do likewise but have found that unnecessary.

There is less of a privacy interest in goods than in a home, but more than in an automobile. Goods are often outside of public view. Unlike automobiles, they are not inherently mobile and their primary function is not transportation. *Cf. United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

The threshold question is whether the transfer of the piperidine into the beeper drum before the defendants took possession of the piperidine was a search. *United States v. Bruneau*, 594 F.2d 1190, 1195 n. 11 (8th Cir. 1979), *cert. denied*, 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61.

The defendants argue that there was a search because they had a Fourth Amendment property or possessory interest at the time the piperidine was transferred. Under Tex.Bus. & Com.Code Ann. §§ 2.401, 2.501, they contend, they had title to the piperidine from the moment it was identified to their contract with McKesson. Even assuming the defendants had title, the Texas UCC is of little use in assessing their possessory rights.[2] The metaphysics of identification and title under UCC determine contract rights. The metaphysics of property interests and possessory interests under the Fourth Amendment determine whether there is a legitimate expectation of privacy. Whether the defendants might have a right to specific performance of the contract if McKesson became insolvent is irrelevant to their privacy interest in a beeper-free drum. Arcane distinctions in contract or property law do not control for Fourth Amendment purposes. *See, e. g., Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

The installation of a beeper in goods physically possessed by the defendants might invade a Fourth Amendment privacy interest, even if the beeper were never activated. There arguably is a right to enjoy the use of goods without the possibility of uninvited monitoring that an unactivated beeper would create. *But cf. United States v. Moore*, 562 F.2d 106 (1st Cir. 1977), *cert. denied*, 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 521 (dictum; by itself, placement of beeper on underbody of van is too minimal a trespass to constitute Fourth Amendment violation). However, there is no possibility of uninvited monitoring, and therefore no privacy interest, before possession begins.

We conclude that, because the defendants lacked any privacy interest in the piperidine or the drum until they took possession, the transfer of the piperidine into the beeper drum was not a search. Our conclusion is similar to that of the First, Ninth and Tenth Circuits, which have found that the Fourth Amendment does not prohibit the placement of a beeper in a drum or box before the defendant takes possession. *United States v. Clayborne*, 584 F.2d 346 (10th Cir. 1978) (implicit); *United States v. Moore*, 562 F.2d at 111 (1st Cir. 1977), *cert. denied*, 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 521 (1978); *United States v. Hufford*, 539 F.2d 32 (9th Cir. 1976), *cert. denied*, 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 614.

The next issue is whether the delivery of the beeper drum to the defendants, and the subsequent use of the beeper, violated the Fourth Amendment. The Fourth Amendment was satisfied because the DEA obtained a warrant authorizing installation and use of the beeper before the defendants took possession.[3] We need not decide whether the Fourth Amendment is violated

---

2. The only defendants with even an *arguable* property interest at the time the piperidine was transferred to the beeper drum were Lewis, who ordered the piperidine, and Hicks, who furnished the $5,000 deposit for the piperidine. Terry was supposed to reimburse Hicks for part of the $5,000 but there is no indication that he ever did. *See generally Rakas v. Illi-*

*nois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

3. A warrant will not be required in future cases where piperidine is transferred into beeper drums because piperidine is now a controlled substance, 21 U.S.C. § 812, 21 C.F.R. Part 1308. Because an improperly obtained controlled substance is contraband, there is no expectation of

by pre-warrant delivery where a warrant is secured before use. Nor need we decide whether the warrantless use of a beeper drum violates the Fourth Amendment.[4]

▮ The defendants contend that the warrant authorizing the beeper was void because in his affidavit Gospodarek intentionally withheld from the magistrate the fact that the piperidine had already been transferred into the beeper drum. Under the holdings in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and *United States v. Astroff*, 578 F.2d 133 (5th Cir. 1978), a warrant may be invalidated for misstatements in an affidavit only if the misrepresentations were material and intentional. The magistrate found no intentional misrepresentation. We adopt his finding.

▮ Finally, appellants challenge the use of the beeper on the grounds that a magistrate in Houston authorized its use, but that it was used outside the district of the magistrate's jurisdiction. The warrant was secured when the drum was in Houston. To require a warrant from each jurisdiction into and through which the drum might travel, or come to rest, would be to put an almost impossible burden upon the government for no valid purpose. This objection is devoid of merit.

### The Warrantless Search of the Livingston Parish Site

▮ The defendants were tracked visually and by beeper until they reached the Livingston Parish site on September 10. After that, DEA agents watched their movements to and from the site. On the night of September 12 or 13, DEA agents made a warrantless visit to the laboratory site. The defendants contend that the warrantless search violated the Fourth Amendment and that the evidence arising from the search must be suppressed.

We disagree. The DEA did not use information from the warrantless search in its affidavit supporting the search warrant for the Livingston Parish site. The affidavit stated that the defendants had purchased chemicals needed for the manufacture of PCP in Houston, using the name of a nonexistent company; that other equipment needed for the manufacture of PCP was purchased in Hammond; that the chemicals and equipment were taken to the Livingston Parish site; and that Lewis and Hicks had a history of drug arrests. The DEA did not use information from the warrantless search at trial. *Cf. United States v. Vicknair*, 610 F.2d 372 (5th Cir. 1980). No evidence from the warrantless search was used. There was nothing to suppress.

### Adequacy of the Warrant

▮ The defendants challenge the warrant on two other grounds. First, they argue that Gospodarek's failure to tell the magistrate of his prior warrantless visit to the site was an intentional and material misrepresentation. Magistrate Polozola found that this was not an intentional misrepresentation. *Franks, supra,* and *Astroff, supra.* We agree.

▮ Second, the defendants contend that the warrant's description of the site to be searched was not specific enough. We disagree. Considering that the lab site was

privacy. *United States v. Pringle*, 576 F.2d 1114 (5th Cir. 1978); *United States v. Emery*, 541 F.2d 887 (1st Cir. 1976).

4. The courts that have considered this issue have focused on the privacy interest in the place where the beeper drum is kept. Thus the Fourth Amendment interest varies depending on whether the drum is being transported in an automobile, is taken into a house, or is left on commercial premises. *See Clayborne, Moore* and *Hufford.* This approach creates confusion, since the drum will often be out of sight of the monitoring authorities, while the Fourth Amendment interest can vary from moment to moment. It also ignores the separate Fourth Amendment interest in the drum itself, apart from the place where the drum is kept. It would be better to focus on the privacy interest in the drum itself.

in a densely wooded tract in a rural area, the description was more than adequate. *United States v. Darensbourg*, 520 F.2d 985 (5th Cir. 1975). We set out the description in the margin.[5]

## Conditional Guilty Pleas

■ The defendants complain because the district court refused to accept their guilty pleas conditioned on the constitutionality of the searches. The district court was correct. *United States v. Sepe*, 486 F.2d 1044 (5th Cir. 1973) (en banc).

## Multiplicitous Offenses and Sentencing

■ The defendants contend that the court erred in entering sentences to consecutive terms for conspiracy to manufacture PCP in violation of 21 U.S.C. § 846; manufacture of PCP in violation of 21 U.S.C. § 841(a)(1); and possession of PCP with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

Their argument is without merit. A conspiracy charge under 21 U.S.C. § 841 is not multiplicitous when joined with substantive charges under 21 U.S.C. § 841(a)(1). *United States v. Foundas*, 610 F.2d 298 (5th Cir.

1980). The manufacturing and possession with intent to distribute counts are derived from the same sentence of 21 U.S.C. § 841(a)(1), as in *United States v. Hernandez*, 591 F.2d 1019 (5th Cir. 1979) (en banc), but they are not multiplicitous. First, the two offenses require different elements of proof. *United States v. Goodman*, 605 F.2d 870 (5th Cir. 1979). Second, in this case, unlike *Hernandez*, the manufacturing charge and the possession charge were not proved by a single event. Instead, there was overwhelming separate proof of each count. The government proved manufacturing by showing that the defendants possessed the equipment and chemicals needed to manufacture PCP, and that they were in the process of manufacturing it. The government proved possession with intent to distribute by showing that the defendants were in possession of a commercially saleable quantity of PCP.

The convictions and sentences of all defendants are AFFIRMED.

---

5. *ATTACHMENT I*

 Location and Description of Area to be Searched

The area to be searched is located in Livingston Parish, Louisiana and can be reached by driving north on LA 43 to the intersection of LA 40; then proceed east bound for 2.9 miles to the intersection of a narrow gravel road which extends northward from LA 40. (Said gravel road appears in the middle of the attached photograph A and perpendicular to the bottom thereof.) The gravel road extends north for approximately 5/10 of a mile and dead ends. At the northernmost end of the road, at a distance of approximately 200 feet to the west is the residence of Edward Fisher, and approximately 300 feet to the northeast are two single-story wood frame houses whose occupants are unknown. Approximately 100 feet southeast of the northernmost end of the gravel road is another single-story wood frame house with a tin roof whose occupants are unknown.

The area to be searched is described as an area of land beginning at the northernmost point of the above-described gravel road and

extending northward for a distance of 1000 feet, thence turning eastward and running to the Livingston Parish-Tangipahoa Parish boundary line (as depicted on the attached Xerox copy of aerial photograph B found in the official records of Livingston Parish; thence turning southward and running to the northernmost edge of the plowed fields (depicted on attached photograph A), a distance of approximately 2000 feet; thence turning westward and running along the northernmost edge of the plowed fields to the previously described gravel road; thence turning northward and running along the said gravel road back to the point of beginning.

Said area includes dense woods and open fields. The above described area is further described as being within Section 2, T–5–S, R–6–E, of Livingston Parish, Louisiana, and *is* depicted on the attached photograph A (and copies thereof) and on the copy of aerial photograph B found in the official records of Livingston Parish, Louisiana.