UNITED STATES of America, Plaintiff-Appellee,

v.

Helen WASHINGTON, J. D. Richard Green, Melvin Jay Quick and Glenn C. Webb, Defendants-Appellants.

Nos. 78–1094, 78–1095.

United States Court of Appeals, Seventh Circuit.

Argued June 9, 1978.

Decided Nov. 15, 1978.

Rehearing and Rehearing En Banc Denied Dec. 15, 1978.

Julius Lucius Echeles, Chicago, Ill., Robert L. Ellison, Rock Island, Ill., for defendants-appellants.

John C. Carver, Asst. U. S. Atty., Springfield, Ill., for plaintiff-appellee.

Before CUMMINGS and TONE, Circuit Judges, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

Count I of a two-count indictment charged defendants-appellants J. D. Richard Green, Melvin Jay Quick, Glenn C. Webb, and Helen Washington with conspiracy to possess with intent to distribute approximately 1,964 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count II charged Green, Quick and Webb with possession with intent to distribute approximately 1.43 grams of cocaine. Following a jury trial all four defendants were found guilty as charged. We affirm the convictions.

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

## I.

On August 15, 1977, a mail parcel arrived at the Miami International Airport from the Panama Canal Zone. The package was addressed to "Miss Sue Patterson, C/O Helen Washington, 1324 North 9th, Quincy, Illinois, 62301," with a return address indicating "Mr. John Stone, P. O. Box 1331, Colon, Rep. Panama." Following customary procedures for handling packages from "high risk zones" such as the Canal Zone, canine specialist Godsey of the U. S. Customs Service placed the package in a special hamper for screening. Thereafter a trained narcotics detection dog by the name of Pepper became aggressive towards the package, indicating that the package contained narcotics.

Having opened the package, Godsey found five wooden objects which he described as lamps or candle holders. Godsey then probed a lamp with a metal coat hanger, and a white powdery substance fell to the table. A field test indicated that the substance was cocaine. With the assistance of a customs inspector Godsey opened the wooden objects and discovered in each a plastic bag containing a white substance. Field tests demonstrated that these bags also contained cocaine.[1] Customs officials then contacted the Miami Drug Enforcement Administration (DEA) office. Upon instructions from DEA, the package was rewrapped and restored as nearly as possible to its original condition. The package was then placed in a locked mail pouch and sent to a Postal Inspector in Springfield, Illinois.

Shortly after receiving the package, Postal Inspector Kell and a DEA agent prepared the package for a controlled delivery. Having opened the package they removed a large plastic bag which contained the five wooden objects and noted that a Panamanian newspaper dated July 25, 1977 had been used as packing. The agent then removed the plastic bags containing the cocaine from the five wooden objects. From one of the bags, he removed and weighed a five-gram sample. That sample was further divided into five one-gram portions. The agent then placed the one-gram portions in separate clear plastic bags, which were folded several times to form small packets.

The agent filled five more plastic bags with a powdery off-white coffee creamer to a volume approximating the original cocaine-filled bags, and embedded the one-gram packets in each bag. The bags were then placed in each of the wooden objects. A felt covering was placed on the bases of the objects so as to conceal the initials placed thereon by the customs inspectors. Pursuant to an order obtained from the district court, an electronic beacon transmitting device was placed in one of the wooden articles. The objects were replaced in the large plastic bag, and were repacked in the original carton with the Panamanian newspaper. The package was then rewrapped, with precautions taken to conceal any indications of tampering.

On the morning of August 23, 1977, government agents attempted a controlled delivery of the parcel to the house at 1324 North 9th Street in Quincy, Illinois. Surveillance agents were scattered throughout the neighborhood, with one agent located in a camper-truck directly across from the house. When he attempted to deliver the package, the regular letter carrier for the neighborhood found no adults at home. The carrier told two children of defendant Washington that he had a package for Sue Patterson in care of Helen Washington, and that he could only make the delivery to an adult. After leaving the residence, the carrier returned the package to a Postal Inspector.

At approximately 3:30 that afternoon defendant Washington's husband arrived at the residence and spoke with the children. About fifteen minutes later defendant Washington arrived. At about 4:15 P.M. Washington and her husband left the house and drove first to a downtown post office in Quincy, and then to the main post office on Katherine Road in Quincy. There defend-

---

1. Subsequent laboratory analysis by a Drug Enforcement Administration chemist showed that the five bags contained a total of 1964 grams of cocaine.

ant Washington approached a postal clerk and asked for the package. The clerk told her that the parcel had been locked up for the night and that it would be delivered on the next day. The Washingtons returned home.

At 5:15 A.M. the next day, August 24, defendants Green, Quick, and Webb checked into a motel in Quincy. Shortly after checking out at 10:39 A.M., the three drove a white over black Cadillac with Iowa license plates slowly past the house at 1324 North 9th Street. The Cadillac circled through the neighborhood and then returned to the 9th Street address, where it was parked directly in front of the house. The three men exited the Cadillac and joined defendant Washington on the porch of the house. A few minutes later, Quick and Webb left the porch and walked around all the streets in the vicinity of the house. Quick and Webb then returned and engaged in a conversation with Green and Washington near the Cadillac. Quick was observed pointing in several directions as he talked.

All four defendants went back to the porch. At about 11:10 the mail carrier arrived and announced that he had a package for Sue Patterson in care of Helen Washington. Washington identified herself and told the carrier to place the package on the porch near the door. The carrier departed, and all four defendants went inside the house, leaving the package on the porch. About ten minutes later, Green, Quick and Webb came out of the house and drove to a nearby store. While they were gone, defendant Washington came out on the porch and shoved the package with her foot across the porch. The three men returned to the house at about 11:30. On his way inside, Green picked up the package.

About five minutes later, the three men emerged from the house and got into the Cadillac. Green was carrying a black plas-

tic bag which contained an object with the same shape and dimension as the mail parcel. The Cadillac was then driven to a nearby restaurant. The three men entered the restaurant and ate while sitting by a window directly in front of the parked Cadillac. They returned to the 9th Street residence for a brief period, and then proceeded to downtown Quincy, and from there across the Mississippi River and into Missouri. Agents followed in their own vehicles, one of which was equipped with a device to receive the signal transmitted from the electronic beacon installed in one of the wooden objects. An agent following the Cadillac in a helicopter received a similar signal and maintained visual surveillance until the helicopter had to land for refueling. The three defendants in the Cadillac drove through Missouri into Iowa.

After passing through Mediapolis, Iowa, the Cadillac passed a cement truck and became lost to the agents' view. Several minutes later the agents were able to pass the truck, but the Cadillac was not in sight. After travelling at speeds in excess of 100 miles per hour for several minutes, the agents were still unable to locate the Cadillac, although they did receive a strong signal from the beacon transmitter.[2] An agent who had earlier passed the Cadillac and sped on ahead was instructed to turn around and to try to locate the Cadillac. After locating the Cadillac, and with the help of local deputy sheriffs, the agent arrested Green, Quick and Webb. A search of the Cadillac revealed the black plastic bag, the large clear plastic bag, and the Panamanian newspaper. The agents also found on the floor of the front seat seventeen pieces of cardboard strips, one of which had been initialed and dated by customs inspectors in Miami. Additional cardboard strips were found on the floor of the rear seat.

---

**2.** With the aid of the helicopter and its receiver, the agents located the wooden object with the transmitting device. The object, a wooden candy holder, was found along a creek bed East of the highway over which defendants had travelled. The candy holder was intact at the time of its recovery. Another object, a broken candle holder, was later discovered close to a bridge spanning the highway. Both wooden objects contained bags with the coffee creamer and the small packets of cocaine.

The three defendants were taken to the Muscatine, Iowa, County Jail. The wallet of defendant Webb was found to contain a piece of paper on which the name "Miss Sue Patterson" had been written. When asked by the agents why he and Webb had walked around the block in Quincy, Quick responded that they "were looking for some ladies." Quick denied that he had ever seen the wooden candy holder, and stated that he had been asleep in the Cadillac from Quincy to Muscatine.

On August 29, defendant Washington consented to an interview at the Quincy Police Department. In response to questions by government agents, she denied receiving the package, being visited by her brother (defendant Green), and visiting the post office on August 23. When confronted by the agents with their observations of what had occurred on August 24, defendant Washington agreed that she had received the package, but explained that she went to the restroom after it was set on the porch and didn't see it again.

## II.

■ We have made this rather detailed statement of what the government's evidence demonstrated because all four defendants contend that the government's proof was insufficient to establish their guilt beyond a reasonable doubt on either the conspiracy charge or the possession with intent to distribute charge. Defendants argue that there was no direct evidence that any of them knew that a controlled substance was contained in the package, that any of them had the controlled substance in his possession at any time, or that any of them ever opened the bag containing the

cocaine packets. In short, defendants argue that the government's evidence consisted merely of a series of mildly suspicious circumstances upon which the jury's verdict may not stand. Viewing, as we must, all the evidence in the light most favorable to the government, and keeping in mind the jury's right to weigh the evidence, determine credibility, and draw justifiable inferences in reaching its verdict, we reject defendants' contentions. *United States v. Page*, 580 F.2d 916, 919 (7th Cir. 1978).

With respect to the conspiracy count we note that the package containing a large amount of cocaine was addressed to the care of defendant Washington, who made inquiries concerning the package after an unsuccessful delivery by the mail carrier. Green, Quick, and Webb arrived at Washington's house shortly before the package was expected to be delivered on August 24th,[3] and immediately engaged in activity which, the jury could infer, amounted to counter-surveillance measures. Further, the evidence demonstrated that the defendants took possession of the package and concealed it in a large black bag. After a relatively short time in Quincy, Green, Quick and Webb began their return journey to Iowa with the package—a circumstance tending to show that they made the trip to Quincy in order to pick up the package. Evidence that the Cadillac travelled at high rates of speed after passing the cement truck, that the torn strips of paper from the package were found throughout the vehicle, and that the two recovered wooden objects were found near creeks are circumstances from which the jury could conclude that Green, Quick, and Webb discovered the interference of government agents with their

---

**3.** Pointing to evidence that there was no telephone at the 9th Street address, all defendants argue that there is a lack of evidence of any communication between Washington and the three other defendants prior to the arrival of the three other defendants at Washington's residence. The record shows that defendant Green, who was Washington's brother, worked the 4:00 P.M. to 12:30 A.M. shift at the International Harvester plant in East Moline, Illinois. Green could only receive emergency phone calls while working. The record further shows

that the surveillance of the Washington residence by government agents terminated at 9:30 P.M. on August 23. In view of the evidence that Green, Quick, and Webb checked into a motel in Quincy at 5:15 A.M. on August 24, the jury could reasonably draw the inference that Green was contacted by his sister sometime after 12:30 A.M. on August 24, and, in view of other circumstantial evidence, that Green, Quick, and Webb made the trip to Quincy for purposes of picking up the package.

plans, and took steps to escape and dispose of the evidence. Finally, Webb's wallet contained a piece of paper with the name "Miss Sue Patterson."

██ By its nature conspiracy is conceived and carried out clandestinely, and direct evidence of the crime is rarely available. Thus, circumstantial evidence from which the jury could reasonably infer the existence of an agreement is permissible. *United States v. Santos*, 385 F.2d 43, 44 (7th Cir. 1967). In view of all the circumstantial evidence of defendants' behavior, together with the false exculpatory statements of Quick and Washington, we find that the jury could properly conclude that all four defendants conspired to knowingly possess with intent to distribute the 1964 grams of cocaine.

██ With respect to the count charging possession with intent to distribute 1.43 grams of cocaine, Green, Quick and Webb argue that the amount possessed was simply too small to permit the jury to infer their intent to distribute. Proof of possession of a small amount of a controlled substance, standing alone, is an insufficient basis from which an intent to distribute may be inferred. *United States v. Olvera*, 523 F.2d 1252 (5th Cir. 1975). But in this case the government's proof demonstrated more than mere possession of 1.43 grams. The circumstantial evidence of the defendants' behavior prior to and after the delivery of the package was sufficient for the jury to draw the inference that defendants knew the package contained contraband. Further, the evidence suggests that Green, Quick and Webb thought they possessed a much larger quantity of cocaine, which would have been the case had not the coffee creamer been substituted. We find ample evidence in the record to support the jury's finding of possession with intent to distribute the cocaine.

**4.** 19 U.S.C. § 126 provides: All laws affecting imports of articles, goods, wares, and merchandise and entry of persons into the United States from foreign countries shall apply to articles, goods, wares, and merchandise and persons

## III.

Defendants also contend that the district court erred in denying their pre-trial motion to suppress. Defendants argue that the customs inspectors had no warrant based on probable cause to open the package in Miami, and that therefore the evidence seized in violation of the Fourth Amendment contributed to their convictions. Further, defendants argue that there was no probable cause to issue an order permitting the installation of the beacon transmitting device. We find no merit to these arguments.

██ In *United States v. Odland*, 502 F.2d 148, 151 (7th Cir. 1974), *cert. denied*, 419 U.S. 1088, 95 S.Ct. 679, 42 L.Ed.2d 680, this Court upheld the sweeping power of the government under applicable regulations to search any person or thing coming into the United States merely because that person or thing was entering the United States from abroad. The Fourth Amendment is simply not applicable to such searches. See *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). In an attempt to circumvent this governmental authority, defendants argue that a package mailed from the Canal Zone is domestic mail, and thus not subject to the sweeping power to search. Whatever may be the status of the Canal Zone vis-a-vis the United States for other purposes, it is clear that for purposes of customs and entry the Canal Zone is a foreign country. 19 U.S.C. § 126 [4]; *David Kaufman & Sons Co. v. Smith*, 216 U.S. 610, 611, 30 S.Ct. 419, 54 L.Ed. 636 (1910). Hence, since Fourth Amendment standards are inapplicable to materials mailed from abroad, a parcel mailed from the Canal Zone is subject to search at its point of entry merely because it enters the United States. *United States v. Ramsey, supra; United States v. Odland, supra; United States v. Beckley*, 335 F.2d 86, 88–89 (6th Cir. 1964), *cert. denied*, 380 U.S. 922, 85 S.Ct. 921, 13 L.Ed.2d 807 (1965).

coming from the Canal Zone, Isthmus of Panama, and seeking entry into any State or Territory of the United States or the District of Columbia.

As to the beacon transmitting device, defendants contend that their Fourth Amendment rights were violated because no probable cause existed for the issuance of the order permitting the installation of the device in the wooden objects. The status of surreptitiously placed electronic tracking devices in the context of Fourth Amendment searches and seizures is not settled. The Fifth Circuit has held that the installation of a transmitter in a vehicle constituted a search within the Fourth Amendment and that government agents "had no right to attach the beacon without consent or judicial authorization." *United States v. Holmes*, 521 F.2d 859, 865 (1975), aff'd. by an equally divided en banc court, 537 F.2d 227 (1976).[5] The First Circuit has held that the installation of electronic devices to monitor the movement of a vehicle violates reasonable, although lessened, expectations of privacy of the operator of the vehicle, but that no warrant is required and no Fourth Amendment violation occurs where government agents have probable cause to believe that the operator of the vehicle is involved in the commission of a crime. *United States v. Moore*, 562 F.2d 106, 112–113 (1977). However, the First Circuit found the lessened expectancy of privacy applicable to vehicles to have no relevancy to packages which do not contain contraband. In that situation, a warrant is required. *Id.* at 113.

■ In view of the record in this case, we leave for another day the question of what role Fourth Amendment principles play in the context of electronic tracking devices. We do not reach this question because the record in this case is clear that the device was implanted in an object containing a contraband substance which the defendants had no right to possess and in which they had no legitimate expectation of privacy.

*United States v. Moore, supra; United States v. Emery*, 541 F.2d 887, 889–890 (1st Cir. 1976); Cf. *United States v. Perez*, 526 F.2d 859 (5th Cir. 1976). Further, even if Fourth Amendment standards for search were applicable to the situation presented by this case, the record demonstrates that those requirements were met. The affidavit of DEA Agent Brunholtz, filed with the government's application for an order permitting the installation of the beacon transmitter in the mail parcel, recited that he had been advised that the results of a field test of the powder found in the package indicated the presence of cocaine; that based on his training and experience the address of the mail parcel might not be the final destination of the parcel; and that once the package was opened, conventional surveillance may prove ineffective in determining the location of the controlled substance. The affidavit provided ample probable cause for the issuance of the order.

## IV.

■ During the trial a government witness testified as to the post-conspiracy statements made by defendants Quick and Washington. Defendants Quick, Green and Webb contend that they were deprived of a fair trial because the jury was not instructed that the post-conspiracy statements of Washington[6] could be considered only against defendant Washington. The record, however, does not support this contention. The record reflects that earlier in the trial a government witness testified as to defendant Quick's post-arrest statement. The district court properly instructed the jury that this evidence could be considered only against the declarant and not against the other defendants. Later in the trial,

---

**5.** In decisions subsequent to *Holmes*, the Fifth Circuit held that the express consent of the owner to the installation of electronic tracking devices in aircraft was within the third party consent exception to the warrant requirement. *United States v. Cheshire*, 569 F.2d 887 (1978), *United States v. Abel*, 548 F.2d 591 (1977). *Accord, United States v. Miroyan*, 577 F.2d 489 (9th Cir. 1978).

**6.** As previously stated herein, during an interview on August 29, 1977, Washington initially denied receiving the mail parcel, visiting the post office, and being visited by her brother, defendant Green.

another government witness, Agent Brunholtz, testified as to the statements of both Quick and Washington. At a side-bar conference following this testimony the prosecutor inquired of the court and defense counsel whether an instruction similar to the earlier instruction limiting the evidence to defendant Quick should be repeated to the jury. Defense counsel indicated that he did not want such an instruction repeated. Further, during his closing argument the prosecutor commendably told the jury that the statements of Quick and Washington could be considered by it only against those individuals. Finally, in a general charge to the jury, Judge Ackerman correctly instructed the jury on how it should consider the statements.[7] In view of these facts we find no error in the failure to give a second limiting instruction after the testimony of Agent Brunholtz.

 We similarly find no merit to defendant Webb's claim that evidence of Quick's statements after being advised of his rights somehow amounted to evidence impliedly informing the jury that Webb chose to remain silent in face of questioning. The record contains no testimony that Webb was ever questioned, or that he refused to answer questions after being advised of his rights. Further, the record shows that Webb was not present in the interrogation room with the agents and Quick. Under such circumstances we are unwilling to speculate, as Webb would have us, that the jury inferred from Quick's post-advisement statements a desire by Webb to remain silent in face of similar questioning.[8]

## V.

The district court imposed on defendants Green, Quick and Webb sentences of fifteen years imprisonment[9] on Count I, to be followed by a five year special parole term; on Count II, the district court imposed sentences of five years probation to commence upon their release from imprisonment under the sentence imposed on Count I.[10] Defendants contend that the district court considered improper factors in setting the sentences. First, Webb and Quick argue that Judge Ackerman impermissibly considered their prior convictions for unlawful possession of marijuana under a statute later held to be unconstitutional by the Illinois Supreme Court in *People v. McCabe*, 49 Ill.2d 338, 275 N.E.2d 407 (1971).

 It is well established that in imposing sentences, "a judge may appropriately conduct an inquiry broad in scope, [and] largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). See also: 18 U.S.C. § 3577. Properly included in this scope of inquiry is information pertaining to the defendants' background, for such information aids the sentencing court in acquiring a thorough acquaintance with the character and history of the defendant before it. *United States v. Doyle*, 348 F.2d 715, 721 (2nd Cir. 1965), *cert. denied*, 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84. In this case we note that the district court was apprised of the fact that the prior convictions were obtained under a statute later held to be unconstitutional. But nothing prevented the district court from considering the de-

---

7. Judge Ackerman instructed the jury: "However, statements of any conspirator, which are not in furtherance of the conspiracy, or made before its existence, or after its termination, may be considered as evidence only against the person making them."

8. Webb relies on *United States v. Bridges*, 499 F.2d 179 (7th Cir. 1974), *United States v. Matos*, 444 F.2d 1071 (7th Cir. 1971), and *United States v. Kroslack*, 426 F.2d 1129 (7th Cir. 1970), in support of his contention. Each of those cases involved testimony by government witnesses that during questioning the defend-

ant chose to remain silent. Those cases thus involved circumstances quite different from the situation presented by the instant case where there was no testimony by any witness that Webb was ever questioned or that he declined to make a statement.

9. The sentences were imposed under the provisions of 18 U.S.C. § 4205(b)(2).

10. Defendant Washington was sentenced to a five year term of imprisonment on Count I, to be followed by a three year special parole term.

fendants' prior criminal involvements [11] in an effort to gain a thorough understanding of their backgrounds. *United States v. Johnson,* 507 F.2d 826, 829–830 (7th Cir. 1974), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975); *United States v. Cifarelli,* 401 F.2d 512 (2d Cir. 1968), *cert. denied,* 393 U.S. 987, 89 S.Ct. 465, 21 L.Ed.2d 448; *United States v. Doyle, supra,* 348 F.2d at 721. Nor do any of the comments of the district court at the time of sentencing indicate in any way that it intended to punish the defendants for their prior criminal involvements. Rather, it clearly appears that the district court properly treated this information as an aid in assessing the backgrounds and characters of the defendants.

■ Defendants secondly contend that in setting the sentences the district court impermissibly penalized them for exercising their Fifth Amendment rights in not discussing the offense with the investigating probation officer after conviction. In view of the record of the sentencing hearing, this contention borders on the frivolous. Defendants refused to provide any information concerning the offense in the presentence report. Prior to the imposition of sentence defense counsel suggested that defendants were only minor operators acting for someone else in a larger conspiracy. In response to this suggestion, the district court remarked that it would have to conclude that defendants acted for themselves since defendants had refused to tell the court anything about their involvement in a larger scheme. It clearly appears from the record that the district court did not penalize the defendants for remaining silent throughout the proceedings against them, but rather that the district court set forth the framework in which it viewed the defendant's involvement in the crimes for which they stood convicted.

### VI.

■ At trial all four defendants were represented by the same counsel. Defendant Webb has separately appealed and claims that he was denied the effective assistance of counsel due to this joint representation. The record shows that prior to trial defense counsel discussed and explained the possibility of conflict with each defendant individually, and advised them that no conflict existed at that time. The record further shows that the district court advised the defendants that they had a right to retain other counsel in the event of a conflict.

In attempting to demonstrate a conflict, and thus ineffective representation, Webb points to the failure of his counsel to request limiting instructions with respect to Washington's initial false exculpatory statements made after the termination of the conspiracy, and with respect to evidence of Quick's post-advisement statements. Having found no error with respect to these contentions in the fair trial context, see Part IV, *supra,* we similarly find in the Sixth Amendment context no conflict amounting to a deprivation of effective assistance of counsel.

For the foregoing reasons, the judgments and sentences of the district court are affirmed.

Affirmed.

---

**11.** At the sentencing hearing former Illinois Bureau of Investigation Agent Erdman testified as to his undercover purchases of drugs from Webb and Quick in 1970.