**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ervin Charles JONES, Defendant–Appellant.**

**No. 92–5823.**

United States Court of Appeals,
Fourth Circuit.

Argued March 31, 1993.

Decided Aug. 10, 1994.

---

1306

**ARGUED:** Marilyn Gerk Ozer, Winston & Massengale, Chapel Hill, NC, for appellant. Robert Holt Edmunds, Jr., U.S. Atty., Greensboro, NC, for appellee. **ON BRIEF:** Barry T. Winston, Winston & Massengale, Chapel Hill, NC, for appellant.

Before ERVIN, Chief Judge, HALL, Circuit Judge, and FABER, United States District Judge for the Southern District of West Virginia, sitting by designation.

Affirmed by published opinion. Judge FABER wrote the majority opinion, in which Judge HALL joined. Chief Judge ERVIN wrote a concurring and dissenting opinion.

## OPINION

FABER, District Judge:

Ervin Charles Jones pleaded guilty to a single count of knowingly purloining an article of registered United States Mail in violation of 18 U.S.C. § 641, and was sentenced to eleven months' imprisonment and three

years' supervised release. Under his plea agreement Jones reserved the right to appeal the district court's ruling denying his motion to suppress evidence. His direct appeal presents three questions for decision: (1) whether the district court erred by declining to suppress evidence allegedly obtained from Jones by postal service inspectors in violation of the Fourth Amendment; (2) whether the court erred by denying Jones a two-level reduction in his sentence, after finding that he had accepted responsibility for his crime; and (3) whether the court erred by including in its calculations of Jones' sentence four prior occasions on which mail had been stolen from the same post office. Finding no merit in any of Jones' assignments of error, we affirm his conviction and sentence.

## I

### A

In early 1992, the defendant Ervin Jones was employed as a Saturday driver by a private trucking firm holding a contract for conveyance of United States Mail in Chapel Hill and Carrboro, North Carolina. Shortly before 4:00 p.m. each Saturday, Jones would drive his personal van to the main post office on Estes Drive in Chapel Hill. Leaving his van in the building's rear parking lot, Jones would drive the tractor-trailer used to haul mail from Estes Drive to the branch offices. At approximately 4:00 p.m. Jones would arrive with the mail truck at the Timberlyne branch office. Leaving the truck at the loading dock, he often would wait in the rear of the post office, chatting with postal workers while they counted monetary receipts and packaged the day's outgoing mail in mail sacks. By 4:30 p.m., postal workers would have loaded the outgoing mail into the trailer and attached a wire seal to the trailer lock. Jones then would drive to the Carrboro post office. There being no postal workers on duty in Carrboro on Saturdays, Jones had to release the wire seal himself, retrieve the outgoing mail from within the post office vestibule, load the mail sacks and packages into his trailer, balance the load in the trailer, and reattach the seal. From Carrboro Jones would return to the Estes Drive office,

where postal workers waited to unload the mail from the trailer. Once Jones reached Estes Drive and backed his truck to the loading dock behind the post office building, his duties for the day were completed. Because the distance between the three post offices is short, Jones usually finished his loading and delivery duties by 5:00 p.m.

On four Saturdays in the winter and spring of 1992, postal service deposit envelopes containing a total of approximately $12,000 in currency and $5,000 in checks were reported missing from registered mail pouches between Timberlyne and the main post office in Raleigh, North Carolina. Jones was the Saturday driver on each of these occasions.

Because of his access to the mail each time it disappeared, Jones was identified as a suspect by federal postal inspectors. On June 20, 1992, as they had done on the three previous Saturdays without success, postal inspectors placed a small electronic transmitter in an envelope addressed to First Citizens Bank in Raleigh, North Carolina. The envelope also contained money, checks and deposit tickets. The envelope was given to the supervisor at the Timberlyne Station who placed it in the day's registered mail. Following normal procedures, the registered envelope was placed in a pouch reserved for bank deposits and sealed with a wire seal bearing an individual number. The number of the seal was recorded on a waybill; the only way to remove the numbered seal was to cut it off the pouch.

At 4:25 p.m., under surveillance by the inspectors, Jones departed Timberlyne for Carrboro. When he arrived at the Carrboro post office, another inspector watched as Jones loaded the outgoing mail into the trailer. Jones was then lost from view inside the trailer for approximately five minutes; he later claimed that he had been balancing the load during this time. A postal inspector who testified at the hearing on Jones' suppression motion stated that on the other three occasions when he watched Jones load the mail at Carrboro, the balancing task required only about thirty seconds.

Emerging from the trailer and reattaching the wire seal, Jones got into the truck,

turned it around, and headed for Estes Drive. Arriving about 5:00 p.m., Jones parked the truck behind the loading dock. While the inspectors watched, he got out and had a brief conversation with a postal worker who was standing on the dock. Jones then walked across the building's back parking lot towards his personal van. The inspectors saw nothing in Jones' hands, nor did they see him place anything in the van. As Jones drove away, the inspectors followed. They immediately began receiving the customary high-pitched beeping signal from the electronic transmitter. From the post office parking lot, Jones turned right onto Estes Drive. Shortly thereafter, he turned right again onto East Franklin Street. The inspectors briefly lost the sound of the transmitter when their vehicle fell slightly behind Jones' van. Upon drawing closer to the van, the sound returned, and the inspectors signalled Jones to stop. Jones pulled his van into the parking lot of a hardware store some seven-tenths of a mile from the Estes Drive post office, and was placed under arrest.

The inspectors drove Jones' van back to Estes Drive, where they impounded it until a search warrant could be obtained. The registered mail pouch, containing only two of the three original deposit envelopes placed in it by the supervisor at Timberlyne, was retrieved from the loading dock of the Estes Drive post office. The pouch had been cut. At 7:43 p.m. one of the inspectors presented an affidavit of the day's events to a North Carolina Superior Court judge, who immediately caused a search warrant to issue permitting the inspectors to seize by June 22, 1992, "registered mail belonging to the U.S. Postal [S]ervice addressed to First Citizens Bank of Raleigh, North Carolina, an electronic transmitting device[,] and U.S. Currency and checks." At 8:30 p.m. the inspectors executed the search warrant. They found the envelope containing the transmitter beneath the driver's seat of Jones' van.

### B

On June 29, 1992, Jones was indicted by a grand jury in the Middle District of North Carolina on a single count alleging theft of United States Mail in violation of 18 U.S.C. § 641. Jones pleaded not guilty. He then filed a motion to suppress the envelope containing the electronic tracking device as evidence, contending that the postal inspectors' stop of his van, the issuance of the search warrant, and the van search itself all violated the Fourth Amendment. Following an evidentiary hearing and oral argument, the district court denied Jones' motion from the bench. Reserving his right to appeal the trial court's ruling on the motion to suppress, Jones then pleaded guilty to the indictment pursuant to a written plea agreement.

At sentencing, the district court found that Jones had not accepted responsibility for his actions pursuant to section 3E1.1 of the United States Sentencing Guidelines, and that Jones' relevant conduct for sentencing purposes included the four occasions before June 20, 1992, on which bank deposits had been taken from the registered mail pouch originating at the Timberlyne Post Office. The court thereupon sentenced Jones to eleven months' incarceration, to be followed by a supervised release term of three years.

This appeal followed.

### II

In his first assignment of error, Jones contends that the district court erred in declining to suppress as evidence the deposit envelope containing the electronic tracking device, because the postal inspectors allegedly obtained the envelope from him in violation of the Fourth Amendment. Specifically, he argues (1) that the postal inspectors' use of an electronic tracking device to monitor the contents of his van constituted a search forbidden by the Fourth Amendment; (2) that the stop of his van was undertaken without probable cause, rendering it a seizure in violation of the Fourth Amendment; (3) that the postal inspectors obtained the search warrant on insufficient indicia of probable cause; and (4) that the search executed by the inspectors pursuant to the warrant exceeded the scope of the warrant, and therefore constituted a generalized search proscribed by the Fourth Amendment. We address these contentions seriatim, reviewing the district court's conclusions of law with respect to them *de novo.* *See United States*

*v. Rusher,* 966 F.2d 868, 873 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992).

## A

### 1

 The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. An individual's capacity to claim the protection of the Fourth Amendment depends not upon a property right in an invaded place, but upon whether the person has a legitimate expectation of privacy in the invaded place. *See Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967). The Fourth Amendment protects this reasonable expectation of privacy against government intrusion. It has long been established that the security provided by the Fourth Amendment against unreasonable search and seizure applies solely to government intrusions. *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921); *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). If there is no government intrusion, the Fourth Amendment is not implicated.

### 2

With this brief background, we turn to the initial issue presented by this appeal: whether the postal inspectors' use of an electronic tracking device to monitor the contents of Jones' van constituted a search forbidden by the Fourth Amendment. Until now, this circuit has not had occasion to confront the Fourth Amendment problems such devices present. Our analysis, therefore, derives directly from the Supreme Court's two rulings on this subject.

In *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), an electronic tracking device was placed inside a five-gallon container of chloroform and sold by a Minneapolis chemical company to one of the defendants, Triston Armstrong. Armstrong delivered the container to codefendant Darryl Petschen, who in turn delivered it to Knotts' cabin nearly 100 miles away in rural Wisconsin. For a time police kept track of the container both by visual surveillance and by monitoring the device's signals, but during the latter part of the journey visual surveillance was curtailed because of Petchsen's evasive driving maneuvers. The signal from the beeper was lost at approximately the same time. An hour later the now-stationary signal was detected at Knotts' cabin. A search warrant was obtained after three days of intermittent visual surveillance. Concluding that scientific enhancement raises no constitutional issues which visual surveillance would not also raise, the Supreme Court held that the monitoring was "neither a 'search' nor a 'seizure' within the contemplation of the Fourth Amendment" because the surveillance did not "invade any legitimate expectation of privacy." *Id.* at 285, 103 S.Ct. at 1087. The Supreme Court granted certiorari in *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), to answer a question it had "left unresolved" in *Knotts:* "[W]hether monitoring of a beeper falls within the ambit of the Fourth Amendment when it reveals information that could not have been obtained through visual surveillance." *Id.* 468 U.S. at 707, 104 S.Ct. at 3299. After a Drug Enforcement Administration agent learned that Karo had ordered fifty gallons of ether, to be used in extracting cocaine from clothing imported into the United States, law enforcement officials obtained a court order authorizing the installation and monitoring of an electronic tracking device in one of the cans of ether. The agents watched Karo retrieve the can of ether from his supplier, followed Karo to his house, and determined by using the beeper that the ether was inside the house. Subsequently, through use of the beeper, the agents determined that the ether had been moved in succession to two other houses, and then to a commercial storage facility. Finally, one of Karo's codefendants moved the ether from a second storage facility to a house rented by other codefendants. Using the beeper monitor, law enforcement authorities determined that the can containing the monitoring device was inside the house, and obtained a warrant to search the house based in part on information derived through use of the beeper. The

Supreme Court noted that it would be an unreasonable search to surreptitiously enter a residence without a warrant to verify that the container was there, and then continued:

> For purposes of the [Fourth] Amendment, the result is the same where, without a warrant, the Government surreptitiously employs an electronic device to obtain information that it could not have obtained by observation from outside the curtilage of the house. The beeper tells the agent that a particular article is actually located at a particular time in the private residence and is in the possession of the person or persons whose residence is being watched. Even if visual surveillance has revealed that the article to which the beeper is attached has entered the house, the later monitoring not only verifies the officers' observations but also establishes that the article remains on the premises.

*Id.* 468 U.S. at 715, 104 S.Ct. at 3303.

The Court thus answered affirmatively the question it had reserved in *Knotts,* holding that monitoring of a beeper falls within the ambit of the Fourth Amendment when it reveals "a critical fact about the interior" of premises that could not have been obtained through visual surveillance. *Id.* at 715–16, 104 S.Ct. at 3303–04.

Neither *Knotts* nor *Karo* directly resolves the question presented by the instant appeal. As was the case in *Knotts,* the postal inspectors' use of an electronic tracking device involved following Jones' van, and in that sense simply augmented their vision of Jones as he drove away from the Estes Drive post office. As happened in *Knotts,* the postal inspectors briefly lost sight of Jones as he turned right onto Franklin Street from Estes Drive. Yet they knew the direction in which he was proceeding, and presumably could have overtaken, or at least continued to pursue him through visual surveillance alone, without the aid of the tracking device.

On the other hand, the inspectors never saw Jones place the envelope containing the transmitter in his van. Their sole grounds for suspicion consisted of (1) the fact that Jones had driven the mail on the other four Saturdays when deposits had gone astray; and (2) the fact that Jones had taken longer than usual to balance the load in the trailer at the Carrboro Post Office. Absent the revelations of the tracking device, they simply had no way of knowing that the transmitter, and the stolen mail pouch in which it was concealed, might be inside Jones' van. Admissibility of the evidence which was seized from Jones' van and which convicted him of the crime charged, therefore, turns squarely on the issue of the propriety of the postal inspectors' use of the electronic tracking device.

We believe it would be a mistake, and a misreading of the Supreme Court's guidance in *Knotts* and *Karo,* to analyze this question solely in terms of Jones' privacy expectation in the interior of his own van. While we agree that Jones had a reasonable expectation of privacy in the interior of his van, we find no government intrusion there. The beeper was not planted in the van; it was concealed in a mail pouch which belonged to the government and in which Jones had no expectation of privacy whatsoever. The mail pouch with the beeper found its way into Jones' van only because Jones stole the pouch and hid it in the van himself.

We do not believe that *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), compels the conclusion that there was a search of Jones' van. The court in *Karo* recognized that concealment of personal property from public view gives rise to Fourth Amendment protections. But here, what was concealed from public view was not personal property, it was stolen government property; this stolen government property with its concealed beeper was in Jones' van only because Jones himself put it there. In contrast, the beeper in *Karo* was concealed in a container of ether which the defendant had purchased. At the times the container in *Karo* was carried by the defendant into his own house, and from there to other places of concealment, it was not contraband; it was personal property belonging to the defendant and in which he had a legitimate expectation of privacy. By hiding a beeper in defendant's property in *Karo,* the government committed an intrusion which is absent in the present case.

While the factual situations are somewhat different, and the cases predate *Karo*, other circuits have been confronted with issues involving beepers placed in packages containing contraband. In *United States v. Perez*, 526 F.2d 859 (5th Cir.), *cert. denied*, 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976), *United States v. Emery*, 541 F.2d 887 (1st Cir.1976) (overruled on other grounds, *United States v. Miller*, 636 F.2d 850 (1st Cir. 1980)), and *United States v. Washington*, 586 F.2d 1147 (7th Cir.1978), the courts of appeals concluded that there was no illegal search because, in each case, the listening device had been implanted in an object containing a contraband substance which the defendant had no right to possess and in which he had no legitimate expectation of privacy. Those cases differ from *Karo* precisely as does our case; in *Karo*, the defendant was in legal possession of a non-contraband object in which the beeper had been placed. Thus, there was in *Karo* an intrusion by the government into an area in which the defendant had a legitimate expectation of privacy, an intrusion which occurred originally when agents placed the beeper in the container of ether Karo had agreed to purchase and which continued as that container was transported by Karo to his house and from there to other places of concealment. A similar intrusion is absent in *Perez*, in *Emery*, in *Washington* and in the case at bar.

The distinction between placing beepers in contraband and placing them in property the possession of which is legal but which may be used in commission of a crime was discussed in *United States v. Moore*, 562 F.2d 106 (1st Cir.1977), *cert. denied*, 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 521 (1978). The court indicated that the Fourth Amendment does not prohibit the placing of beepers in contraband and stolen goods because "the possessors of such articles have no legitimate expectation of privacy in substances which they have no right to possess at all." *Id.* at 111. The court in *Moore* held, however, that the Fourth Amendment was violated when a beeper was placed in chemicals to be used in the manufacture of illegal drugs but which, in and of themselves, were not contraband or otherwise wrongfully in defendant's posses-

sion, the very situation which existed in *Karo*. Thus the court in *Moore* recognized the clear distinction between the facts of *Karo* and the circumstances of the present case, holding that in the former situation there is an illegal search and in the latter there is not. *Id.*

Justice O'Connor, in her concurring opinion in *Karo*, in which the Chief Justice joined, focused on the very problem presented in the case at bar and its distinction from *Karo*. Noting that the privacy interests involved in cases such as these are extremely narrow, she continued as follows:

> [O]ne who lacks ownership of the container itself or the power to move the container at will, can have no reasonable expectation that the movements of the container will not be tracked by a beeper within the container, regardless of where the container is moved. In this situation the absence of an appropriate interest in the container itself defeats any expectation of privacy in the movements of the container, even when the container is brought into places where others may have a privacy interest.

468 U.S. at 722, 104 S.Ct. at 3307.

*Karo*, in contrast to the case at bar, and to *Perez*, *Emery* and *Washington*, raises the disturbing specter of government agents hiding electronic devices in all sorts of personal property and then following private citizens who own such property as they go about their business. This case presents no such danger. Here, the government has placed the electronic device in its own property. Only purloiners of such property need fear adverse consequences.

Accordingly, we conclude that the postal inspectors' use of an electronic tracking device to monitor movement of the mail pouch did not constitute a search within the ambit of the Fourth Amendment.

**B**

Because they share the question of probable cause, we review Jones' second and third assignments of error together. First, we ask whether the postal inspectors' stop of Jones' van was undertaken without probable cause, rendering it a "seizure" forbidden by the

Fourth Amendment. Then we seek to ascertain whether the warrant obtained by the inspectors to search the van's interior was supported by sufficient indicia of probable cause.

### 1

The Fourth Amendment's protection of an individual's "effects" is preserved by the requirement that searches and seizures be conducted pursuant to a warrant issued by an independent judicial officer. U.S. Const. amend. IV. One of the earliest exceptions to the warrant requirement recognized by the Supreme Court was the "automobile exception" at issue in this case. In the Prohibition-era decision of *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Court recognized that privacy interests in an automobile are constitutionally protected; the Justices held, however, that the automobile's ready mobility justifies a lesser degree of protection of those interests than would be afforded by a stationary structure. That a motor vehicle is readily mobile does not, however, mean that it may be seized and searched upon a mere pretext. As the Court made clear in *Carroll,* "[t]he measure of legality of such a seizure is, therefore, that the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes has contraband ... therein which is being illegally transported." *Carroll,* 267 U.S. at 155–56, 45 S.Ct. at 286. We must, therefore, determine whether the postal inspectors' seizure of the van was supported by probable cause sufficient to enable the government to invoke the automobile exception.

■Probable cause is, at best, a nebulous concept. *See United States v. Williams,* 974 F.2d 480, 481 (4th Cir.1992) (per curiam) (noting that "[t]he probable cause standard is not defined by bright lines and rigid boundaries"). For Fourth Amendment purposes, at least as such amendment relates to an arrest, probable cause means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979). This court has explained that:

> [W]hether probable cause exists in a particular situation ... always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct. Probable cause therefore could be lacking in a given case, ... either because of an ... officer's insufficient factual knowledge, or legal misunderstanding, or both.

*Pritchett v. Alford,* 973 F.2d 307, 314 (4th Cir.1992) (citations omitted); *see Sevigny v. Dicksey,* 846 F.2d 953, 956–59 (4th Cir.1988).

■When the inspectors stopped Jones, they knew that he had been the mail driver on the four previous occasions when deposit envelopes had disappeared from the Timberlyne Post Office's registered mail pouch. They also knew that Jones had taken somewhat longer than usual to balance the load in the trailer while collecting the outgoing mail at the Carrboro branch. Finally, they knew an electronic transmitter had been concealed in a mail pouch originally in Jones possession—a transmitter which now emitted a signal from Jones' private van, a place where the mail pouch had no legitimate right to be. These three facts, viewed in combination, were sufficient to warrant a prudent person in believing that Jones was committing a crime when he drove away from the Estes Drive post office on June 20. A suspect's conduct, as known to the postal inspectors, and the contours of the offense he was believed to have committed in the past were hardly susceptible to any other hypothesis.

Accordingly, we conclude that the postal inspectors' seizure of Jones' van was supported by sufficient indicia of probable cause to permit the seizure to fall within the automobile exception to the Fourth Amendment's warrant requirement.

### 2

■The quantum of probable cause required for a search warrant to be valid under the Fourth Amendment is identical to the

quantum necessary for the seizure of a motor vehicle to fall within the automobile exception to the warrant requirement. In order to establish probable cause, the facts presented to the magistrate need only "warrant a [person] of reasonable caution in the belief" that contraband or evidence of a crime will be found in the place to be searched. *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (plurality opinion). The probable cause standard "does not demand any showing that such a belief be correct or more likely true than false." *Id.*

■ The decisions of the Supreme Court, as well as our own more recent efforts, consistently establish that "[g]reat deference is to be given a magistrate's assessment of the facts when making a determination of probable cause." *United States v. Williams,* 974 F.2d 480, 481 (4th Cir.1992). *See Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590–91, 21 L.Ed.2d 637 (1969); *United States v. Blackwood,* 913 F.2d 139, 142 (4th Cir.1990). Applying this level of deference, our inquiry is directed to whether the magistrate had a "substantial basis" for his conclusion that probable cause existed. *Williams,* 974 F.2d at 481; *Blackwood,* 913 F.2d at 142.

■ Accordingly, for the same reasons we concluded the seizure of Jones' van was supported by probable cause, we find that the warrant which the postal inspectors obtained before searching the interior of Jones' van was supported by sufficient indicia of probable cause to be constitutionally valid.

## C

Finally, we consider Jones' contention that the scope of the search as executed by the postal inspectors so exceeded the scope of the warrant as to render the entire search constitutionally invalid.

■ The Warrant Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. The Fourth Amendment thus prohibits general warrants and general searches. *See, e.g., Andresen v. Maryland,* 427 U.S. 463,

480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976); *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 511–12, 13 L.Ed.2d 431 (1965). The search warrant at issue in this case authorized the seizure of: "registered mail belonging to the U.S. Postal Service addressed to First Citizens Bank of Raleigh, North Carolina, an electronic transmitting device and U.S. Currency and checks payable to Postmaster or U.S. Postal Service." The warrant confines the executing inspectors' discretion by allowing them to seize only evidence of a particular crime. Thus, the warrant describes the items to be seized with sufficient particularity to satisfy the Fourth Amendment. *See United States v. Fawole,* 785 F.2d 1141, 1144 (4th Cir.1986); *United States v. Ladd,* 704 F.2d 134, 136 (4th Cir. 1983).

Jones contends, however, that even if the warrant was not a general one, the search as executed constituted a general search because many insignificant, irrelevant items were seized. He notes that the postal inspectors seized not only the envelope containing the electronic transmitter, but also a cellular telephone, a cassette radio, speaker boxes, a notebook, a power amplifier, and a radar detector. The irrelevant items were later returned to Jones.

Jones points to *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), as standing for the principle that: "[i]f the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Id.* at 140, 110 S.Ct. at 2309–10. Jones' reliance on *Horton* to support his argument that the investigators' seizure of irrelevant items warrants exclusion of the envelope containing the electronic transmitter is misplaced. In *Horton,* a police officer sought a warrant to search the home of petitioner, Horton, who was suspected of armed robbery. Although the officer sought a warrant permitting him to search for both the proceeds of the robbery and the robbers' weapons, the magistrate issued a search warrant authorizing the officer to search Horton's home only for the proceeds of the rob-

bery and not the weapons. Upon execution of the search warrant, the proceeds of the robbery were not found. However, the officer executing the warrant did locate the robber's weapons in plain view and seized them. *Id.* at 130, 110 S.Ct. at 2304. Horton challenged the seizure of such weapons as violating his Fourth Amendment rights.

Because the officer in *Horton* did not locate the proceeds of the robbery, which were the objects for which the search warrant was issued, the court did not reach the question of whether the officer's seizure of objects not authorized by the search warrant warranted exclusion of those objects for which a search was authorized by the search warrant. Instead, the analysis in *Horton* deals with the unrelated question of whether weapons found in plain view during a search for other objects pursuant to a search warrant could be properly seized under the Fourth Amendment.

■ Furthermore, the specific language Jones cites from the *Horton* decision illustrates that the *Horton* court's holding mandates the exclusion of only that evidence obtained by officers during the time in which they are acting outside of the search warrant. Specifically, the *Horton* court states that if the scope of the search exceeds the terms of the warrant, "the *subsequent* seizure is unconstitutional without more." *Id.* at 140, 110 S.Ct. at 2310 (emphasis added). The court's use of the words "subsequent seizure" indicates that only the items seized by officers while acting outside of the scope of the search warrant are to be excluded. Therefore, while all evidence which is not identified within a search warrant may be excluded if the executing officer exceeds the scope of the warrant, such exclusion does not extend to evidence actually named in the search warrant which is discovered during the course of the search.

Such a rule has been previously recognized by this circuit in *United States v. Borromeo,* 954 F.2d 245 (4th Cir.1992). In *Borromeo,* this court noted that " '[t]he exclusionary rule does not compel suppression of evidence properly covered by a warrant merely because other material not covered by the warrant was taken during the same search.' "

*Id.* at 247 (citing *United States v. Shilling,* 826 F.2d 1365 (4th Cir.1987)). Admittedly, an exception to this general rule exists in extreme circumstances. The exclusion of evidence properly seized pursuant to a valid search warrant may be required "if the officers executing the warrant exhibit 'flagrant disregard' for its terms." *Borromeo,* 954 F.2d at 246. Unfortunately, the record before the court sheds little light upon the circumstances surrounding the actual execution of the search warrant in this case. The only witness who testified at the hearing held to consider Jones' motion to suppress, postal inspector James Hash, was not personally present during the execution of the search warrant. While Mr. Hash identified a list of items seized from Jones' automobile, and stated that the investigators who actually executed the warrant told him that they had seized some of the items contained in the list, Mr. Hash did not offer testimony as to the reasons for the seizure of the additional items. (J.A., Vol. I at 74–76). Based upon the record before the court, we are unable to conclude that the investigators' actions in seizing the additional irrelevant items constituted "flagrant disregard" for the terms of the search warrant. Accordingly, the only remedy which may be available to Jones as a result of the investigators' actions would be the exclusion of the additional irrelevant items, and not the exclusion of the letter containing the transmitting device. The government, however, did not intend to introduce any of the irrelevant items its agents seized as evidence at Jones' trial; indeed, the items were promptly returned to Jones shortly after their seizure. Obviously, then, the seizure of the extraneous items could not have affected any jury's consideration of Jones' guilt.

■ Accordingly, we hold that the inspectors' failure to restrain their search within the precise bounds of the search warrant does not constitute "flagrant disregard" for the terms of the search warrant, and does not warrant exclusion of the letter containing the electronic transmitter since the search for such letter was clearly authorized by the search warrant.

### III

We now address Jones' two remaining assignments of error, both of which attack the legality of his sentence. The standard of review on appeal of a sentencing judge's application of the United States Sentencing Guidelines depends on the issues presented by the appellant. If the issue turns primarily on a factual determination, we apply the "clearly erroneous" standard. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985). If the issue, on the other hand, turns primarily on the legal interpretation of a guideline term, the standard moves closer to *de novo* review. Mixed questions of law and fact are reviewed on a sliding scale, depending upon whether the issues are essentially factual or legal in nature under the due deference standard. *See United States v. Daughtrey*, 874 F.2d 213, 217 (4th Cir.1989).

### A

First, Jones contends that the district court erred by finding that he had accepted responsibility for his crime, but then denying him a two-level reduction in his offense level.

The law with respect to a defendant's acceptance of responsibility for sentencing purposes is well-settled in this circuit. The defendant has the burden of proving by a preponderance of the evidence mitigating factors that would lower his ultimate sentencing range. *United States v. Urrego–Linares*, 879 F.2d 1234, 1238–39 (4th Cir.), *cert. denied*, 493 U.S. 943, 110 S.Ct. 346, 107 L.Ed.2d 334 (1989). The defendant has the burden of establishing by a preponderance of the evidence the applicability of the mitigating factor in question—in Jones' case, that he accepted responsibility for his criminal conduct. *United States v. Harris*, 882 F.2d 902, 907 (4th Cir.1989); *Urrego–Linares*, 879 F.2d at 1238–39. Whether Jones has met this burden is a factual issue, and the district court's decision will not be disturbed unless clearly erroneous. *United States v. White*, 875 F.2d 427, 431 (4th Cir.1989).

Although the district court found that Jones ultimately had accepted responsibility for his crime, it denied him the two-level reduction he sought on the ground that his acceptance was not timely. Section 3E1.1 of the guidelines, which governs acceptance of responsibility, states: "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S.S.G. § 3E1.1. Application Note 1(h) of the commentary to section 3E1.1 states that, in determining whether the defendant qualifies for this downward adjustment, the district court may consider, *inter alia*, "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." U.S.S.G. § 3E1.1 application note 1(h).

We agree with the Court of Appeals for the Tenth Circuit that "[o]n the issue of timeliness, the district court has substantial discretion." *United States v. Trujillo*, 906 F.2d 1456, 1461 (10th Cir.), *cert. denied*, 498 U.S. 962, 111 S.Ct. 396, 112 L.Ed.2d 405 (1990). Indeed, as Application Note 5 to section 3E1.1 adds, "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. § 3E1.1 application note 5. Our careful review of the record in this case indicates that the district court took great pains in arriving at its decision that Jones was not entitled to an offense-level reduction for acceptance of responsibility. The court's factual finding that Jones did not accept responsibility for his crime in the timely fashion contemplated by section 3E1.1 can be reversed on appeal only if the finding was clearly erroneous. Because we observe no clear error here, we decline to disturb the district court's decision to deny Jones a two-level reduction in his offense level for purposes of sentencing.

### B

Second, Jones contends that the district court erred by including in its calculation of his sentence the four prior occasions on which deposit envelopes had vanished from the Timberlyne Post Office's registered mail pouch.

■ Section 1B1.3 of the sentencing guidelines permits district courts to take "relevant conduct" into account in determining a defendant's sentence under the guidelines. As the commentary to this section explains, the "principles and limits of sentencing accountability" are not always the same as those of criminal liability. U.S.S.G. § 1B1.3 application note 1. Convicted defendants can be held accountable for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured or willfully caused by the defendant. . . ." U.S.S.G. § 1B1.3(a)(1)(A). The defendant need not be convicted of the charges constituting relevant conduct for him still to be held accountable for them. Yet the government must establish the existence of these other incidents by a preponderance of the evidence. *See United States v. Uwaeme*, 975 F.2d 1016, 1018 (4th Cir.1992). Whether the government has successfully shouldered its burden of proof is a question of fact, which we review only for clear error. *See United States v. Daughtrey*, 874 F.2d 213, 217 (4th Cir.1989).

At the sentencing hearing the government adduced evidence (1) that mail containing cash and checks had been stolen from a registered mail pouch dispatched from the Timberlyne Post Office on four Saturdays (February 8, 1992, February 22, 1992, April 25, 1992, and May 23, 1992); (2) that Jones had been the mail driver on each of these occasions; (3) that Jones had access to the registered mail pouch containing the cash and checks when he balanced the load of the trailer at the Carrboro Post Office; (4) that Jones was the only person who could have broken the seal on the trailer at Carrboro on the relevant dates; and (5) that Jones regularly had seen Timberlyne postal workers counting money prior to its dispatch, and often asked how much cash was in the shipment.

■ Jones objects to the district court's use of this evidence to establish his accountability for the four previous thefts on the grounds that the evidence is both circumstantial and constitutes inadmissible hearsay within the purview of the Federal Rules of Evidence. *See* Fed.R.Evid. 801(c). These objections are meritless. It is well-established that circumstantial evidence alone can be sufficient to support any burden of proof, even where, as in a matter of substantive criminal liability, the prosecution's proof must be beyond a reasonable doubt. *See, e.g., Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949); *United States v. Watford*, 894 F.2d 665, 670 (4th Cir.1990). The Federal Rules of Evidence state that the formal rules of evidence do not apply to sentencing hearings, *see* Fed.R.Evid. 1101(d)(3); moreover, the commentary to section 6A1.3 of the sentencing guidelines notes that in determining relevant facts, "[r]eliable hearsay evidence may be considered." U.S.S.G. § 6A1.3 commentary; *see also United States v. Terry*, 916 F.2d 157, 160–161 (4th Cir.1990) (noting that "United States courts have a long history of using reliable hearsay for sentencing").

■ The government needed only to prove the relevant conduct by a preponderance of the evidence. We cannot say that the district court clearly erred by concluding that the government successfully had shouldered this burden of proof. We therefore affirm the court's use of the four previous thefts of cash and currency as relevant conduct in calculating Jones' sentence.

### IV

For the foregoing reasons, both the district court's denial of Jones' motion to suppress and Jones' sentence are hereby

*AFFIRMED.*

ERVIN, Chief Judge, concurring in part and dissenting in part:

I am in agreement with my colleagues on most of the issues in this case as well as with the ultimate decision to affirm the judgment of the district court.

Believing, however, that the postal inspectors' use of electronic tracking devices to monitor the interior of Jones' van, an area in which he retained a reasonable expectation of

privacy,[1] was a search in violation of the Fourth Amendment, I respectfully dissent from Part IIA2 of the majority opinion.

My brethren address in detail the two decisions of the Supreme Court discussing this problem, *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), and *United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), so no purpose is to be served by my duplicating their summaries of the facts in those two cases.

By way of explanation of its holding that the monitoring in *Knotts* did not constitute a search or a seizure because there was no invasion of a legitimate expectation of privacy, the Court said:

A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another. When Petschen traveled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was traveling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property.

. . . .

Admittedly, because of the failure of the visual surveillance, the beeper enabled the law enforcement officials in this case to ascertain the ultimate resting place of the chloroform when they would not have been able to do so had they relied solely on their naked eyes. But scientific enhancement of this sort raises no constitutional issues which visual surveillance would not also raise. A police car following Petschen at a distance throughout his journey could have observed him leaving the highway and arriving at the cabin owned by respondent, with the drum of chloroform still in the car.

460 U.S. at 281–82, 285, 103 S.Ct. at 1085, 1087.

I believe that the Court's analysis in *Knotts* rests upon an assumed equivalence between "visual surveillance" and "scientific enhancement." Visual surveillance from public places along Petschen's route, or adjoining Knotts' premises, would have sufficed, the Court suggests, to reveal both his progress and the location of Knotts' cabin to the police. *Id.* at 282, 103 S.Ct. at 1086. "Nothing in the Fourth Amendment," however, "prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case." *Id.*

In deciding *Karo*, as the majority concedes, the Court held that monitoring of a beeper falls within the ambit of the Fourth Amendment when it reveals "critical information about the interior of premises" that could not have been obtained through visual surveillance." 468 U.S. at 715, 104 S.Ct. at 3303. That the beeper was inside the house in *Karo* could not have been visually verified without the monitor.

I agree with the majority that neither *Knotts* nor *Karo* resolves the question presented by Jones' Fourth Amendment challenge in this case. However, I am convinced that on balance this case is more closely akin to *Karo* than to *Knotts*, because the postal inspectors were using the beeper in the instant case to see what they could not possibly have seen without its assistance. The inspectors admitted in the affidavit accompanying their application for the search warrant that the beeper was being used not to trace the movements of Jones' van, but instead to search the interior of the van and ascertain its contents. Jones was followed as he drove away from the post office and *it was determined that the electronic device was transmitting a signal from his vehicle.* (emphasis added). At the suppression hearing the district court found as a fact that the inspectors used the beeper to ascertain the van's contents: "They picked up what they recognized was a signal of the device they had been using . . . (which) gave them reason to believe that the package may have been in his

1. It is important to remember that the government in the instant case conceded that Jones had a reasonable expectation of privacy in his van, and that the case was tried upon that assumption.

car." The inspectors employed the beeper not to enhance their visual ability to follow Jones' van, but instead used it to determine whether a deposit envelope was inside the vehicle. Electronic tracking to augment visual surveillance would have been permissible under *Knotts; Karo,* on the other hand, makes clear that technology cannot be used to transmute the powers of the human eye into those of an x-ray microscope. *See Karo,* 468 U.S. at 714–15, 104 S.Ct. at 3303.

The Court in *Karo* did at one point characterize the question presented in terms of "whether the monitoring of a beeper in a private residence, a location not open to visual surveillance," is a search. *Karo,* 468 U.S. at 714, 104 S.Ct. at 3303. As has been pointed out, however, the opinion opened with a broader statement of the issue: "Whether the monitoring of a beeper falls within the ambit of the Fourth Amendment when it reveals information that could not have been obtained through visual surveillance." *Id.* at 707, 104 S.Ct. at 3296. As a leading commentator has opined, these two characterizations are different, and together create some uncertainty with respect to the dimensions of the *Karo* holding. *See* La-Fave, *Search and Seizure,* § 2.7(d), at 530. I agree with Professor LaFave that the underlying principle of *Karo* is not limited to the "monitoring of a beeper in a private residence." *Karo,* 468 U.S. at 714, 104 S.Ct. at 3303. As three partially concurring Justices noted, the Court also recognized generally that "when a person's property is concealed from public view, ... then the fact of his possession is private and the subject of Fourth Amendment protection." *Karo,* 468 U.S. at 731, 104 S.Ct. at 3311 (Stevens, J., joined by Brennan and Marshall, J.J., concurring in part and dissenting in part[2]. In my view, the touchstone principle of *Karo*— that an electronic tracking device may not be used to enable law enforcement agents to learn facts not exposed to public view—is not

limited to structures or effects qualifying as private residences.

The majority relies on some cases from several of our sister circuits, but I will not discuss or distinguish them, in light of my colleagues' forthright admissions that their factual situations are somewhat different (from our case) and that they all predate *Karo.* I would also suggest, in this connection, that their reliance on a concurring opinion in *Karo* (in which only one other justice joined) is of limited value, at best.

I am in accord with Justice White's assertion that requiring a warrant will have the salutary effect of ensuring that use of beepers is not abused, by imposing upon agents the requirement that they demonstrate in advance their justification for the desired search. 468 U.S. at 717, 104 S.Ct. at 3304.

I believe that a proper reading of *Knotts* and *Karo* requires us to hold that the postal inspectors' use of an electronic tracking device to monitor the interior of Jones' van, an area in which he retained a reasonable expectation of privacy, constituted a search in violation of the Fourth Amendment, and I dissent from that portion of the majority opinion holding otherwise.

I reiterate, however, that I am in agreement with the remainder of the majority opinion and that as a consequence, I join in holding that the decision of the district court should be affirmed.

---

**2.** Justice Stevens, Justice Brennan, and Justice Marshall concurred in Part III of the *Karo* majority's opinion, which concluded that when beeper surveillance reveals the location of property that has been concealed from public view, a "search" within the meaning of the Fourth Amendment

has occurred. *Karo,* 468 U.S. at 728, 104 S.Ct. at 3310 (Stevens, J., joined by Brennan and Marshall, J.J., concurring in part and dissenting in part); *see also id.* at 713–18, 104 S.Ct. at 3302–05 (Part III of the majority opinion).