**CORRECTED OPINION**

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                                    No. 97-4179

ANTHONY ZENONE,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                                    No. 97-4190

MICHAEL ZENONE,
Defendant-Appellant.

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Frederick N. Smalkin, District Judge.
(CR-96-190)

Argued: March 6, 1998

Decided: August 10, 1998

Before MURNAGHAN and WILLIAMS, Circuit Judges, and
BROADWATER, United States District Judge for the
Northern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Aron Uri Raskas, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for Appellant Anthony Zenone; Gerald Chester Ruter, Baltimore, Maryland, for Appellant Michael Zenone. Thomas Michael DiBiagio, Assistant United States Attorney, Baltimore, Maryland, for appellee. **ON BRIEF**: Andrew Jay Graham, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for Appellant Anthony Zenone. Lynne A. Battaglia, United States Attorney, Baltimore, Maryland for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Two brothers, Anthony Zenone and Michael Zenone, appeal their convictions in the United States District Court for the District of Maryland for several bank robberies. Anthony Zenone was convicted by a jury of two counts of bank robbery in violation of 18 U.S.C. § 2113(a) and (f) and two counts of using and carrying a firearm in connection with a crime of violence in violation of 18 U.S.C. § 924(c). After entering a guilty plea to a third count of bank robbery, upon which the jury deadlocked, Anthony Zenone was sentenced to 408 months of imprisonment. Michael Zenone was convicted of two counts of bank robbery in violation of 18 U.S.C.§ 2113(a) and (f) and was sentenced to 144 months of imprisonment. In this consolidated appeal, the Zenones raise nine challenges to their convictions as follows: first, that the district court erred in refusing to conduct a Franks[1]

_____

[1] The decision of Franks v. Delaware, 438 U.S. 154 (1978), requires a hearing when a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in an affidavit for a search warrant so as to establish probable cause.

2

hearing; second, that the district court erred in failing to suppress evidence seized pursuant to a search warrant; third, that the court failed to suppress items seized outside the scope of the warrant; fourth, that the district court failed to suppress the contents of a video tape seized pursuant to the search warrant; fifth, that the district court failed to conduct an array of shotguns before identified by witnesses; sixth, that the district court erred as to Michael Zenone's sentence in applying a six level enhancement pursuant to U.S.S.G.§ 2B3.1(b)(2)(B); seventh, that the district court also erred as to Michael Zenone's sentence by making a two level upward departure pursuant to U.S.S.G. § 5K2.3; eighth, that the district court erred in sentencing Anthony Zenone to consecutive sentences; and ninth, that the district court failed to change venue or sequester the jury in light of extensive pre-trial publicity. Finding no reversible error in the above issues, we affirm both convictions.

I.

The first bank robbery occurred in 1993. On September 2, 1993, the First National Bank located in Arnold, Maryland, was robbed by two men. When the robbers entered the bank, they were dressed in dark business suits and wore presidential masks. The first robber wore a President Reagan mask. The second robber wore a President Nixon mask. Both men were armed with shotguns. One of the shotguns had a camouflage sling. Once in the bank, the first robber approached the teller line while the second robber remained near the front door. The first robber then gave precise instructions about the denominations of the currency that he wanted, that he should not be given a dye pack, and that alarms should not be activated. He used profanity throughout the robbery to intimidate and control the victims. After obtaining the money, the robbers left the bank. This bank was insured by the Federal Deposit Insurance Corporation (FDIC).

The second bank robbery occurred several years later. On April 9, 1996, two men entered the Mercantile Safe Deposit and Trust Company Bank located in Baltimore, Maryland. They spoke with a teller about banking services, apparently cashed a check, and then left. On April 12, the two men returned and robbed the bank of $8,403.00. At the time of the robbery, this bank's deposits were also insured by the FDIC. During this robbery, both men entered the bank wearing dark

3

ski masks over their faces and carrying shotguns. The first robber carried a modified shotgun with an attached telescopic site and magazine extension tube. This modified shotgun had a distinct appearance, which was visible on the bank surveillance cameras and was recognizable by the victims.

The first robber with the modified shotgun entered the bank and announced the robbery. He screamed commands to the customers and employees. He gave precise instructions about the denominations of the currency that he wanted, that he should not be given a dye pack, and that alarms should not be activated. He used profanity throughout the robbery. The tellers then placed the money from their drawers on the counter. Then, the first robber systematically worked his way down the teller line taking money at each station and placing the money into a green backpack. Before leaving the bank, the first robber again threatened the employees and customers."He again admonished the tellers and everyone in the bank against calling the police, that he was willing and able to kill anybody who came after him." (Joint Appendix (J.A.) at 281.)

During this robbery, the second masked robber stood in the vestibule with his back holding open the door and pointing his shotgun at the customers and employees in the bank. As both men were leaving the bank, the first robber threw a smoke grenade into the vestibule. Witnesses saw the robbers leaving the bank in a blue sedan, "possibly an Oldsmobile Cutlass with a luggage rack on the trunk lid, Maryland license tag CHC 475." (J.A. at 62.)

The third bank robbery occurred a few weeks later. First, on April 19, 1996, one of the robbers entered the First Virginia Bank located in Towson, Maryland and made inquiries about opening a checking account. Then, on April 26, 1996, the two robbers returned to this bank and robbed it of $3,543.00. At the time of the robbery, this bank's deposits were also insured by the FDIC. Both men entered the bank wearing dark ski masks over their faces and carrying shotguns. Both men used the weapons similar to those utilized in the April 12, 1996 Mercantile Bank robbery. The first robber used a modified shotgun with a scope identified by the victims. This time, the first robber also wore an ammunition belt. Both robbers were seen arriving at the

4

bank in a blue sedan, "possibly an Oldsmobile or Buick bearing a Maryland license tag number AKB 336." (J.A. at 63, 408.)

The first robber entered the bank and approached the teller line. As he came into the lobby, he pumped a shell into the shotgun's chamber and announced the robbery. He gave precise instructions regarding the denominations of the currency he wanted, that he should not be given a dye pack, and that alarms should not be activated. He used profanity throughout the robbery.

During this robbery, the second robber also stood in the vestibule with his back holding the door open and pointing his shotgun toward the employees in the bank. As he was leaving the bank, the first robber stopped and told the tellers that if they called the police he would come back to kill them. The second robber detonated a smoke grenade in the vestibule upon leaving the bank.

After investigating information that developed during the two April 1996 bank robberies, and based upon the evidence obtained, Special Agent John W. Barry of the Federal Bureau of Investigation (FBI) prepared a detailed twenty-nine paragraph, eight page affidavit in support of a federal search warrant. (J.A. at 61-68.) He began the affidavit with the events concerning the April 12 robbery of the Mercantile Bank and detailed the victim's physical description of the robbers. Importantly, Special Agent Barry recounted how bank employees recalled that two white males came to the bank on April 9 and appeared to pay close attention to the surveillance system and physical layout of the bank. Special Agent Barry next obtained still photographs of these two white males from the bank surveillance videotape. After flyers were distributed to local law enforcement agencies, a Baltimore County officer recognized Michael Zenone from prior employment with him. Special Agent Barry then focused his investigation upon Michael Zenone and his brother, Anthony Zenone. Based upon additional evidence set forth in this affidavit, Magistrate Judge Paul M. Rosenberg issued a search warrant for their joint residence at Baltimore, Maryland.

On May 4, 1996, pursuant to this federal search warrant, the FBI searched the joint residence of the Zenones located at 4411 Forest

5

View Lane, Baltimore, Maryland. The FBI discovered the following evidentiary items in Anthony Zenone's locked bedroom closet:

1. Remington 870 12 gauge shotgun with Weaver scope, installed backwards, loaded magazine extension tube with shells.

2. Ithaca 12 gauge shotgun.

3. Savage 7mm rifle.

4. Presidential mask of Ronald Reagan.

5. Camouflage ammunition sling.

6. Video tape labeled "Tony and Lynette" containing news reports of crimes including the September 2, 1993, robbery of the First National Bank, and several other armed robberies where the robbers used firearms and wore presidential masks, a double murder committed in June 1995 in Baltimore County, Maryland and a murder committed in Anne Arundel County in 1993.

The FBI then discovered following evidence located in the basement of the Zenones' joint residence:

1. Body armor.

2. Five body armor carriers.

3. Bullet proof inserts.

4. Bullet proof vest.

5. Two black ski masks.

6. Smoke grenade.

7. Maryland license plate CHC 475.

6

8. Maryland license plate AKB 336.

9. Green backpack.

The FBI discovered $4,610.00 in cash in Anthony Zenone's bedroom dresser drawer. This money contained five $20 bait bills taken during the April 26, 1996 robbery of The First Virginia Bank. Bait bills are paper currency with previously recorded serial numbers for identification purposes. The FBI also seized numerous other items as listed on the warrant return which they felt had evidentiary value.

On July 31, 1996, Anthony Zenone and Michael Zenone were indicted by a federal grand jury in Baltimore, Maryland and charged in a superseding indictment with bank robbery in violation with 18 U.S.C. § 2113(a) and (f) and with the use and carrying of a firearm in connection to a crime of violence in violation of 18 U.S.C. § 924(c). The Zenones were charged with all three bank robberies.

The Zenones' first trial began on September 30, 1996 and concluded on October 7, 1996. Anthony Zenone was convicted of robbing the Mercantile Bank on April 12, 1996 and using a shotgun in connection with this offense (Counts Three and Four of the superseding indictment) and was also convicted of robbing the First Virginia Bank on April 26, 1996 as well as using a shotgun in connection with this offense (Counts Five and Six). The jury did not reach a verdict on Counts One and Two relating to the 1993 bank robbery. On December 13, 1996, Anthony Zenone plead guilty to robbing the First National Bank on September 2, 1993 (Count One) and the use of weapons charge related to this robbery was dismissed (Count Two).

On October 7, 1996, the jury acquitted Michael Zenone on Counts One and Two of the superseding indictment relating to the 1993 bank robbery. The jury was unable to reach a verdict on the remaining counts against him. On December 9, 1996, Michael Zenone was retried. On December 11, 1996, Michael Zenone was convicted of robbing the Mercantile Bank on April 12, 1996 and the First Virginia Bank on April 26, 1996. (Counts Three and Five). He was acquitted of Counts Four and Six relating to the use of a shotgun during these robberies.

7

II.

The first four issues raised by the Zenones all relate to the search warrant executed at their residence on May 4, 1996. The Zenones argue that the evidence seized should be suppressed. The parties do not dispute that when testing the sufficiency of a search warrant and its supporting affidavit, the standard of review is de novo. United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1989); see also United States v. Hodges, 705 F.2d 106 (4th Cir. 1983). In this review, great deference is to be given to a magistrate's assessment of facts when making a determination of probable cause. United States v. Jones, 31 F.3d 1304, 1313 (4th Cir. 1994).

A.

The issues raised by the requested Franks hearing and the alleged failure to suppress the search warrant are intertwined. Accordingly, they will be addressed together.

In Franks v. Delaware, 438 U.S. 154, 155 (1978), the Supreme Court considered the issue of whether a criminal defendant has the right to challenge the truthfulness of factual statements made in affidavits filed in support of a search warrant. The Supreme Court held that "[w]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affidavit in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." Id. at 155-56. Further, we have recognized that "Franks protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990).

The district court in this case ruled upon the Zenones' request for a Franks hearing and the motion to suppress in a Memorandum and Order entered on August 23, 1996. In paragraphs 4 and 6 of that order, the district court considered and rejected their contentions. (J.A. at 162-63.) Anthony Zenone again raised the Franks issue at a

pretrial hearing held on September 30, 1996. The district court again considered and rejected the basis for the request.

As discussed above, on a challenge to the sufficiency of a search warrant affidavit, the reviewing court accords "great deference" to the issuing magistrate's determination. United States v. Clyburn, 24 F.3d 613, 617 (4th Cir. 1994). A reviewing court is to simply ensure that the magistrate judge had a substantial basis for concluding that probable cause existed and not to second-guess the magistrate judge. Jones, 31 F.3d at 1313.

The Zenones assert that they met the requirements for a Franks hearing. First, as to the four alleged false statements in the search warrant, the Zenones claim a showing of an "offer of proof" "accompanied by a statement of supporting reasons." Franks, 438 U.S. at 171. Second, the Zenones argue that they have shown that the four false statements were essential to the probable cause determination. After reviewing the record, we conclude that the grounds relied upon by the Zenones do not establish any intentional or material misrepresentations.

The first of the four alleged false statements concerns whether the defendants were checking the physical layout and surveillance systems of the Mercantile Bank on April 9, 1996 in preparation of the robbery or were there legitimately conducting banking business.[2] The

_____

[2] This first alleged false statement comes from paragraph 5 of Special Agent Barry's affidavit dated May 3, 1996. This paragraph states as follows:

> 5. Investigation incidental to this last robbery disclosed that on Tuesday, April 9, 1996, that two white males entered the above described bank seeking information regarding the establishment of a checking account. Both men spoke to tellers at the teller counter area. These individuals were subsequently located on bank surveillance video tape, which had been obtained as a result of the robbery. The bank surveillance film, as well as still images, were reviewed with the appropriate bank employees, who recalled that neither of the men conducted any bank business, and that both men appeared to pay particular attention to the surveillance system and physical layout of the bank. (J.A. at 62.)

9

Court concludes that this merely reflects a disagreement of interpretation. As well, the government did not learn that the teller failed to mention that Anthony Zenone cashed a check during this visit until the Zenones' pretrial memorandum was filed on July 2, 1996.

We also conclude that this same disputed interpretation of events applies to the second statement questioned by the Zenones in the affidavit. This statement concerns whether Michael Zenone engaged in counter-surveillance techniques in May, 1996 when the FBI was investigating the Zenones.[3] This does not establish an intentional or material misrepresentation.

The third area of alleged false statements concerns the description of the getaway car and the vehicle owned by Anthony Zenone.[4] A

_____

[3] Paragraph 16 of Special Agent Barry's affidavit states as follows:

> 16. On May 5, 1996, Michael Zenone was followed from his place of employment to his home. While in route, he demonstrated numerous counter surveillance techniques. He repeatedly made U-turns, drove 20 miles per hour under the posted speed limit, and randomly pulled into parking lots along his route only to pull out into traffic after several minutes. On April 30, 1996, Anthony Zenone demonstrated similar counter surveillance techniques, entering parking lots and proceeding down dead end roads. (J. A. at 65.)

[4] The descriptions of the vehicles are contained in several paragraphs of Special Agent Barry's affidavit as follows:

> Paragraph 3: Witnesses at the bank [Mercantile] observed two robbers enter into a blue, four door sedan, possibly an Oldsmobile Cutlass with a luggage rack on the trunk lid, Maryland license tag CHC475. (J.A. at 62.)

> Paragraph 6 in part: The robbers were observed by witnesses, both prior to entering the bank [First Virginia] and after exiting the bank, to be operating a blue colored sedan, possibly an Oldsmobile or Buick, bearing a Maryland license tag number AKB336. (J.A. at 63.)

> Paragraph 14 in part: Anthony Zenone is a registered owner of a 1994 Oldsmobile, four door sedan, Maryland registration CNH458, at 4411 Forest View Avenue, Baltimore, Maryland. (J.A. at 63.)

reading of the affidavit shows no direct assertion that the vehicle used in the bank robberies was actually owned by Anthony Zenone. While the Zenones concede that the make and model of the vehicle used in the robberies was similar to Anthony Zenone's vehicle, they claim that these statements were a material misrepresentation because the affidavit failed to disclose that the color of the vehicles was different. Anthony Zenone's car was red and also did not have a luggage rack. As well, Michael Zenone owned a blue-grey Chrysler Lebaron. We find no material misrepresentation from these statements as they are Special Agent Barry's statements concerning the similarity of both vehicles.

The fourth statement concerns whether Anthony Zenone failed to work on the days of the two robberies in April 1996. Special Agent Barry stated in his affidavit that Anthony Zenone, although scheduled to work on both days, did not show up for work. The government points out, and the Zenones do not contradict, that this assertion was not made before the district court. Therefore, the Zenones waived this ground and are precluded from relying upon it for appeal. See Fed. R. Crim. P. 12(f); United States v. Wilson, 115 F.3d 1185, 1190 (4th Cir. 1997).

In this case, we conclude that probable cause existed to support the issuance of a search warrant for the Zenone residence. Special Agent Barry's detailed affidavit provided a wealth of facts linking the Zenones to the commission of the two April 1996 bank robberies. The required nexus for probable cause between the place to be searched and the evidence of criminal activity to be seized was clearly shown. United States v. Williams, 974 F.2d 480, 481-82 (4th Cir. 1992). For these reasons, we conclude that the district court properly denied the Franks hearing and the motion to suppress.

_____

Paragraph 24: Witnesses at the April 12, 1996 bank robbery (described in Paragraph 1) observed two robbers enter into a blue, four door sedan, possibly an Oldsmobile Cutlass with a luggage rack on the trunk lid, Maryland license tag CHC475. (J.A. at 67.)

11

B.

The Zenones next assert that the district court should have suppressed items they claim were seized outside the scope of the search warrant. The Zenones claim that the FBI agents acted with flagrant disregard for the warrant and transformed a particularized warrant into a general, unrestricted search, requiring therefore, that all of the evidence seized be suppressed. Jones, 31 F.3d at 1314; United States v. Borromeo, 954 F.2d 245, 246 (4th Cir. 1992). In this regard, the Zenones assert that the voluminous return of items seized pursuant to the search warrant support this contention.

The district court rejected the Zenones' contentions before trial. The district court ruled that the items were seized in plain view during the execution of a valid search warrant and were either contraband or fruits of criminal activity. Many of the listed items were clearly the fruits of criminal activity as they remained in original packaging with store labels attached. The district court relied on United States v. Legg, 18 F.3d 240, 242 (4th Cir. 1994), which upheld the seizure of a pistol found in plain view during the search of an apartment pursuant to a warrant.

In order to justify a warrantless seizure under the plain view doctrine, three conditions must be met. First, the seizing officer must be lawfully present on the premises. Second, the officer must have a lawful right of access to the object itself. Third, the object's incriminating character must be immediately apparent. United States v. Wells, 98 F.3d 808, 809-10 (4th Cir. 1996). As did the district court, we conclude that the evidence shows that all three conditions were met. As well, the government also points out that since those items were not introduced into evidence at trial, it does not affect the admissibility of other relevant evidence legally seized. See Jones, 31 F.3d at 1314.

C.

Last, the Zenones contend that two video tapes were also illegally seized at their residence. The Zenones argue that the district court was required to suppress evidence used by the government in its case in chief that was "seized without scrupulous adherence to the warrant...." United States v. Heldt, 668 F.2d 1238, 1260 & n. 33 (D.C. Cir. 1981);

12

Borromeo, 954 F.2d at 245. Specifically, Anthony Zenone argues that the district court erred when it denied his motion to suppress the first video tape labeled "Tony and Lynette," which was seized from his locked bedroom closet. Michael Zenone also complains that the district court erred when it failed to suppress a second video tape labeled "Mom and Dad's Copy," which was also seized from a closet.

The government contends that the criminal character of the first video tape was immediately apparent once viewed. This tape contained televisions news stories about the bank robberies in question. The government further contends that the second video tape was relevant in that it showed Michael Zenone's unlimited access to areas within the residence. Specifically, the tape also demonstrated his access to the basement where several items of evidence were found linking him to the two bank robberies.

In citing United States v. Lowe, 50 F.3d 604, 607 (8th Cir. 1995), the district court held that the "seizure and reviewing of the video-tapes from the residence was plainly authorized by the warrant and lawful, given their location and their tendency to link the defendant to the place to be searched." (J.A. at 164-65.) The government points out that the video tapes were the only items found in each closet and that each video tape linked the defendants to the residence. The government also relies on Lowe which held that the search and seizure of a video tape was authorized by the warrant as an item that linked the defendant therein with the residence. We also agree with the district court's ruling on that basis.

III.

The Zenones next contend that the district court erred when it refused to conduct an array, or "line-up," of the shotguns before introducing them at trial. The Zenones point out that the government relied upon eye-witness identification of the distinct weapons the robbers used to link the Zenones to the crimes. The government conceded at trial that none of the victims would be able to identify the robbers because of the masks worn during each robbery. The Zenones equate eye-witness identification of individuals with that of physical objects such as the shotguns. The Zenones assert that a criminal defendant has a due process right to prevent suggestive police identification pro-

13

cedures that create "a very substantial likelihood of irreparable misi-identification." United States v. Concepcion , 983 F.2d 369, 377 (2d Cir. 1992). Concepcion involved the identification of a defendant within minutes of a shooting by a show-up at a hospital. The Zenones do not cite any specific authority for a line-up of physical objects.

The government counters that a defendant's due process right to reliable identification procedures does not extend beyond normal authenticity and identification procedures for physical evidence. Johnson v. Sublett, 63 F.3d 926, 932 (9th Cir. 1995) (holding that while this argument deserves credit for creativity, there is no authority for a defendant's asserted due process right to reliable identification procedures beyond normal authenticity and identification procedures). Johnson concerned a victim's in-court identification of an automobile used to carry a victim in the course of a kidnaping. Id.

Therefore, the government maintains that this issue relates to an evidentiary ruling. Thus, the standard of review is whether the district court abused its discretion in admitting testimony of the similarity of the shotguns found at the Zenones' residence with those used in the robberies. United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997) (evidentiary rulings are reviewed for abuse of discretion and are subject to harmless error review). As the Zenones did not present any other argument or decisions to support reversal of the district court's evidentiary decision, we affirm on this issue.

IV.

Michael Zenone asserts two errors concerning the application of the United States Sentencing Guidelines (U.S.S.G.) to his sentence. The first concerns the district court's findings as to the use of a shotgun during the robberies. The second concerns the district court's upward departure based upon psychological injury to the victims.

A.

Specifically, Michael Zenone objects to the district court's findings relating to the use of a firearm during the commission of a crime. U.S.S.G. § 2B3.1 assigns robbery a base offense level of 20. This

14

base level is increased six levels if a firearm was otherwise used. U.S.S.G. § 2B3.1(b)(2)(B). He claims that the facts support a five level enhancement for brandishing a deadly weapon under U.S.S.C. § 2B3.1(b)(2)(C). Michael Zenone does not rely on any decisions of this Court. His counsel cites United States v. Matthews, 20 F.3d 538 (2nd Cir. 1994) (holding that implicit threat coupled with literal explicit threat that may constitute additional conduct, but does not constitute additional use of weapon for guideline purposes).

In reviewing the application of the guidelines by the district court, we examine factual determinations for clear error. United States v. Blake, 81 F.3d 498, 503 (4th Cir. 1996). Further, legal questions are subject to a de novo standard of review. Id.; see also United States v. Singh, 54 F.3d 1182, 1190 (4th Cir. 1995).

Prior to sentencing, the district court rejected Michael Zenone's argument based on brandishing. The Court found that Michael Zenone's conduct went "far beyond mere brandishing of a weapon, to actual menacing of the tellers with very frightening weapons at close range, with death threats." (J.A. at 206.) At sentencing, the district court further found that when a shotgun is "pointed at somebody, ... together with death threats ... either before or at the moment [the shotguns] were brandished, ... especially [with] very crude threats with violent and profane language..." the acts are beyond mere brandishing and justify a six level increase. (J.A. at 649.)

A review of the record indicates that the district court's findings of fact were not clearly erroneous. Moreover, we agree that Michael Zenone's conduct, i.e., pointing his shotgun at a teller and threatening to kill her, went beyond mere brandishing. See United States v. Fuller, 99 F.3d 926, 927 (9th Cir. 1996) (holding that "pointing [a] firearm at [a] teller and explicitly threatening to kill her . . . exceeded mere brandishing"); United States v. Seavoy , 995 F.2d 1414, 1422 (7th Cir. 1993) (holding that "pointing of a firearm, combined with an explicit threat" constitutes "otherwise using"); United States v. Johnson, 931 F.2d 238, 240 (3d Cir. 1991) (leveling a firearm at a victim's head and threatening to discharge it properly classified as "otherwise using" a firearm). But see Matthews, 20 F.3d at 554 (holding that "an explicit verbal threat may constitute additional conduct, but it does not, in our view, constitute additional use of the weapon").

15

Therefore, the district court did not err in finding that Michael Zenone "otherwise used" a firearm.

B.

Michael Zenone alleges error concerning the district court's two level upward departure. This departure was based upon the district court's application of U.S.S.G. § 5K2.3 in finding that Michael Zenone's conduct caused extreme psychological injury to several robbery victims. As above, the same two part inquiry and standard of review apply to this assignment of error.

At the sentencing hearing, the government presented five victim impact statements and the testimony of three victim tellers. This compelling evidence detailed substantial emotional, behavioral, and psychological impairment of these victims. Based upon the severity of the psychological injury described by these witnesses and the district court's findings of the intent or knowing risks of such injury by Michael Zenone's actions, the district court decided it was within its discretion in ruling a two level upward departure pursuant to U.S.S.G. § 5K2.3.

The standard of review of the district court's decision on the application of the sentencing guidelines point is a two part inquiry. The first part concerns the district court's findings of fact, reviewed under a clear error standard; the second part involves the application of the guideline in question, being an abuse of discretion standard. United States v. Barber, 119 F.3d 276, 282 (4th Cir. 1997), cert. denied, 118 S.Ct. 457 (1997); United States v. Achiekwelu , 112 F.3d 747, 755-56 (4th Cir. 1997), cert. denied, 118 S.Ct. 250 (1997).

We find that the record indicates that an upward departure was authorized in this case. See United States v. Gary, 18 F.3d 1123, 1129 (4th Cir. 1994) (citing that district court's determination under U.S.S.G. § 5K2.3 is to be given considerable deference). The district court's findings of fact and weighing of guideline factors do not indicate an abuse of discretion. Again, the procedures used were consistent with those established in Koon.

16

V.

Anthony Zenone challenges the district court's application of consecutive sentences under 18 U.S.C. § 924(c). The basis of this challenge is the assertion that both offenses were one continuing criminal scheme. He takes exception to this Court's holding in United States v. Camps, 32 F.3d 102, 206 (4th Cir. 1994). Camps held that a defendant who has used a firearm on "several separate occasions during the course of a single continuing offense ... has committed several § 924(c)(1) offenses." Id. He relies on opposite holdings by several other circuits. See, e.g., United States v. Anderson, 59 F.3d 1323 (D.C. Cir. 1995); United States v. Lindsay, 985 F.2d 666 (2nd Cir. 1993); United States v. Sims, 975 F.2d 1225 (6th Cir. 1992).

The issues raised by Anthony Zenone involve questions of law, and the standard of review is de novo. United States v. Childress, 104 F.3d 47, 49 (4th Cir. 1996). The record in this case clearly indicates Anthony Zenone's participation in two bank robberies. These two bank robberies occurred two weeks apart. Therefore, we concur that the district court was authorized to impose two consecutive sentences. See 18 U.S.C. § 924(c); Deal v. United States, 508 U.S. 129, 131 (1993) (upholding district court's consecutive sentences for six bank robberies on different dates and six counts of carrying and using a firearm during each robbery).

VI.

Last, Anthony Zenone asserts error based upon the district court's denial of his motion for a change of venue or for sequestration of jurors. Anthony Zenone relies upon the allegation that pretrial publicity threatened his due process right to a fair trial which, at least, required the sequestration of jurors. United States v. Concemi, 957 F.2d 942, 946 (1st Cir. 1992). In affirming the conviction, the First Circuit in Concemi noted that sequestration was an extreme measure to control prejudicial information and stated that the district court still has the option to instruct the jury to avoid the publicity. Id.

The district court followed the required two-step analysis concerning a change of venue. United States v. Bailey , 112 F.3d 758, 769 (4th Cir. 1997), cert. denied, 118 S. Ct. 240 (1997). First, the district court

17

considered whether the publicity was so inherently prejudicial that the trial process would be tainted. Id. The district court found that the publicity did not rise to the level of being inherently prejudicial. Second, the district court conducted voir dire examination of prospective jurors to determine if actual prejudice existed. Id. Apparently, only one juror was excused based upon extensive exposure to news reports. Thereafter, the district court admonished the jury to avoid news reports. As well, the district court inquired as to such news report exposure each morning before the start of trial. Therefore, the district court did not abuse its discretion in denying this motion.

VII.

For the foregoing reasons, both convictions and sentences are affirmed.

AFFIRMED

18